# DETROIT EDISON CO. *v.* NATIONAL LABOR RELATIONS BOARD

No. 77-968.   Argued November 6, 1978—Decided March 5, 1979

302

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined, and in all but Part II–A of which STEVENS, J., joined. STEVENS, J., filed an opinion concurring in part and·dissenting in part, *post,* p. 320. WHITE, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, and in Part I of which STEVENS, J., joined, *post,* p. 320.

*John A. McGuinn* argued the cause for petitioner. With him on the briefs was *Leon S. Cohan.*

*Norton J. Come* argued the cause for respondent. With him on the brief were *Solicitor General McCree, Louis F. Claiborne, John S. Irving, Carl L. Taylor,* and *David S. Fishback.**

MR. JUSTICE STEWART delivered the opinion of the Court.

The duty to bargain collectively, imposed upon an employer by § 8 (a)(5) of the National Labor Relations Act,[1] includes a duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative. *NLRB* v. *Truitt Mfg. Co.,* 351 U. S. 149; *NLRB* v. *Acme Industrial Co.,* 385 U. S. 432. In this case an employer was brought before the National Labor Relations Board to answer a complaint that it had violated this statutory duty when it refused to disclose certain information about employee aptitude tests requested by a union in order to prepare for arbitration of a grievance. The employer supplied the union with much of the information requested, but refused to disclose three items: the actual test questions, the actual employee answer sheets, and the scores linked with the names of the employees who received them.[2] The Board, concluding that all the items requested were relevant to the grievance and would be useful to the union in processing it,

---

*Briefs of *amici curiae* urging reversal were filed by *Bruce L. Montgomery* for the American Psychological Assn.; by *Thaddeus Holt, William J. Kilberg,* and *Lawrence Z. Lorber* for the American Society for Personnel Administration et al.; and by *William J. Rodgers* and *Stephen A. Bokat* for the Chamber of Commerce of the United States.

*Burt Pines, Cecil W. Marr,* and *John W. Witt* filed a brief for the city of Los Angeles et al. as *amici curiae.*

[1] 29 U. S. C. §§ 151–158.

[2] The arbitration was subsequently held without the benefit of this information, subject to the stipulation that the union could reopen the award if a court ordered disclosure of these materials. See *infra,* at 308.

ordered the employer to turn over all of the materials directly to the union, subject to certain restrictions on the union's use of the information. 218 N. L. R. B. 1024 (1975). A divided Court of Appeals for the Sixth Circuit ordered enforcement of the Board's order without modification. 560 F. 2d 722 (1977).

We granted certiorari to consider an important question of federal labor law. 435 U. S. 941. This is apparently the first case in which the Board has held that an employer's duty to provide relevant information to the employees' bargaining representative includes the duty to disclose tests and test scores achieved by named employees in a statistically validated psychological aptitude testing program administered by the employer. Psychological aptitude testing is a widely used employee selection and promotion device in both private industry and government. Test secrecy is concededly critical to the validity of any such program, and confidentiality of scores is undeniably important to the examinees. The underlying question is whether the Board's order, enforced without modification by the Court of Appeals, adequately accommodated these concerns.

I

The petitioner, Detroit Edison Co. (hereinafter Company), is a public utility engaged in the generation and distribution of electric power in Michigan. Since about 1943, the Utility Workers Union of America, Local 223, AFL–CIO (Union) has represented certain of the Company's employees. At the time of the hearing in this case, one of the units represented by the Union was a unit of operating and maintenance employees at the Company's plant in Monroe, Mich. The Union was certified as the exclusive bargaining agent for employees in that unit in 1971, and it was agreed that these employees would be covered by a pre-existing collective-bargaining agreement, one of the provisions of which specified that promotions within a given unit were to be based on seniority "whenever reasonable qualifications and abilities of the employees being considered

are not significantly different." Management decisions to bypass employees with greater seniority were subject to the collective agreement's grievance machinery, including ultimate arbitration, whenever a claim was made that the bypass had been arbitrary or discriminatory.

The aptitude tests at issue were used by the Company to screen applicants for the job classification of "Instrument Man B." An Instrument Man is responsible for installing, maintaining, repairing, calibrating, testing, and adjusting the powerplant instrumentation. The position of Instrument Man B, although at the lowest starting grade under the contract and usually requiring on-the-job training, was regarded by the Company as a critical job because it involved activities vital to the operation of the plant.

The Company has used aptitude tests as a means of predicting job performance since the late 1920's or early 1930's.[3] In the late 1950's, the Company first began to use a set of standardized tests (test battery) as a predictor of performance on the Instrument Man B job. The battery, which had been "validated" for this job classification,[4] consisted of the

---

[3] Aptitude tests are not designed to measure current knowledge and skills relevant to a job, but, instead, to measure the examinee's ability to acquire such knowledge and skills.

[4] The Company used the empirical method of establishing validity; that is, it analyzed the requirements of the Instrument Man B job and developed objective measures by which supervisors were to rate the performance of employees in this job classification. Incumbents were given the preselected tests, and their scores were then compared with the supervisory ratings. A statistically significant correlation between the scores and the ratings was demonstrated.

Both the Company and the Union were named defendants in a lawsuit in which various Company employment practices, including aptitude tests used for other job classifications, were found to violate Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.* See *Stamps* v. *Detroit Edison Co.*, 365 F. Supp. 87, 118–119 (ED Mich. 1973), rev'd as to remedy, *EEOC* v. *Detroit Edison Co.*, 515 F. 2d 301 (CA6 1975), vacated and remanded, *Detroit Edison* v. *EEOC*, 431 U. S. 951 (1977), superseding

Wonderlic Personnel Test, the Minnesota Paper Form Board (MPFB), and portions of the Engineering and Physical Science Aptitude Test (EPSAT). All employees who applied for acceptance into the Instrument Man classification were required to take this battery. Three adjective scores were possible: "not recommended," "acceptable," and "recommended." [5]

In the late 1960's, the technical engineers responsible for the Company's instrumentation department complained that the test battery was not an accurate screening device. The Company's industrial psychologists, accordingly, performed a revalidation study of the tests. As a result, the Personnel Test was dropped, and the scoring system was changed. Instead of the former three-tier system, two scores were possible under the revised battery: "not recommended" and "acceptable." The gross test score required for an "acceptable" rating was raised to 10.3, a figure somewhat lower than the former score required for a "recommended" but higher than the "acceptable" score used previously.

The Company administered the tests to applicants with the express commitment that each applicant's test score would remain confidential. Tests and test scores were kept in the offices of the Company's industrial psychologists who, as members of the American Psychological Association, deemed themselves ethically bound not to disclose test information to

---

order entered, *EEOC* v. *Detroit Edison Co.*, 17 E. P. D. ¶ 8583 (ED Mich. 1978), notice of appeal filed, Aug. 24, 1978. The issues in the present unfair labor practice litigation are distinct, and nothing in this opinion, particularly use of such words as "valid" or "validate," is to be understood as bearing in any way on possible Title VII questions. Cf. *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 425–436.

[5] During the decade or so that this test battery was in use, only one grievance involving it was filed. In that instance, a senior employee who had received an "acceptable" score was bypassed for acceptance in favor of a junior employee who had received a higher "recommended" score. The grievance was upheld.

unauthorized persons.[6]   Under this policy, the Company's psychologists did not reveal the tests or report actual test numerical scores to management or to employee representatives.   The psychologists would, however, if an individual examinee so requested, review the test questions and answers with that individual.

The present dispute had its beginnings in 1971 when the Company invited bids from employees to fill six Instrument Man B openings at the Monroe plant.   Ten Monroe unit employees applied.   None received a score designated as "acceptable," and all were on that basis rejected.   The jobs were eventually filled by applicants from outside the Monroe plant bargaining unit.

The Union filed a grievance on behalf of the Monroe applicants, claiming that the new testing procedure was unfair and that the Company had bypassed senior employees in violation of the collective-bargaining agreement.   The grievance was rejected by the Company at all levels, and the Union took it to arbitration.   In preparation for the arbitration, the Union requested the Company to turn over various materials related to the Instrument Man B testing program.   The Company furnished the Union with copies of test-validation studies performed by its industrial psychologists and with a report by an outside consultant on the Company's entire testing program.   It refused, however, to release the actual test battery, the applicants' test papers, and their scores,

---

[6] See American Psychological Assn., Standards for Educational and Psychological Tests (1974).   Standard J–2 prohibits disclosure of aptitude tests and test scores to unauthorized individuals.   See also Ethical Standards of Psychologists (1977 rev.).   Principle 5 of the Ethical Standards imposes an obligation on the psychologist to safeguard "information about an individual that has been obtained . . . in the course of . . . teaching, practice, or investigation."   Subsection (b) of the Principle permits the psychologist to discuss evaluative data concerning employees but only if the "data [is] germane to the purposes of the evaluation" and "every effort" has been made to "avoid undue invasion of privacy."

maintaining that complete confidentiality of these materials was necessary in order to insure the future integrity of the tests and to protect the privacy interests of the examinees.

The Union then filed with the Board the unfair labor practice charge involved in this case. The charge alleged that the information withheld by the Company was relevant and necessary to the arbitration of the grievance, "including the ascertainment of promotion criteria, the veracity of the scoring and grading of the examination and the testing procedures, and the job relatedness of the test(s) to the Instrument Man B classification."

After filing the unfair labor practice charge, the Union asked the arbitrator to order the Company to furnish the materials at issue. He declined on the ground that he was without authority to do so. In view of the pendency of the charges before the Board, the parties proceeded with the arbitration on the express understanding that the Union could reopen the case should it ultimately prevail in its claims. During the course of the arbitration, however, the Company did disclose the raw scores of those who had taken the test, with the names of the examinees deleted. In addition, it provided the Union with sample questions indicative of the types of questions appearing on the test battery and with detailed information about its scoring procedures. It also offered to turn over the scores of any employee who would sign a waiver releasing the Company psychologist from his pledge of confidentiality. The Union declined to seek such releases.

The arbitrator's decision found that the Company was free under the collective agreement to establish minimum reasonable qualifications for the job of Instrument Man and to use aptitude tests as a measure of those qualifications; that the Instrument Man B test battery was a reliable and fair test in the sense that its administration and scoring had been standardized; and that the test had a "high degree of validity" as

a predictor of performance in the job classification for which it was developed. He concluded that the 10.3 score created a "presumption of significant difference under the contract." [7] He also expressed the view that the Union's position in the arbitration had not been impaired because of lack of access to the actual test battery.

Several months later the Board issued a complaint based on the Union's unfair labor practice charge. At the outset of the hearing before the Administrative Law Judge, the Company offered to turn over the test battery and answer sheets to an industrial psychologist selected by the Union for an independent evaluation, stating that disclosure to an intermediary obligated to preserve test secrecy would satisfy its concern that direct disclosure to the Union would inevitably result in dissemination of the questions. The Union rejected this compromise.

The Administrative Law Judge found that notwithstanding the conceded statistical validity of the test battery, the tests and scores would be of probable relevant help to the Union in the performance of its duties as collective-bargaining agent. He reasoned that the Union, having had no access to the tests, had been "deprived of any occasion to check the tests for built-in bias, or discriminatory tendency, or any opportunity to argue that the tests or the test questions are not well suited to protect the employees' rights, or to check the accuracy of the scoring." The Company's claim that employees' privacy might be abused by disclosure to the Union of the scores he rejected as insubstantial. Accordingly, he recommended that

---

[7] The arbitrator did conclude, however, that the 10.3 cutoff score was too high because it eliminated some applicants who would probably succeed in the Instrument Man job. Based on the Company's validation statistics, he concluded that seniority would be undermined unless those applicants who had received scores of between 9.3 and 10.3 were given an opportunity to demonstrate that they had other qualifications that might offset their somewhat lower scores. Three applicants were in this group. As a result of the evaluation ordered by the arbitrator, one was promoted.

the Company be ordered to turn over the test scores directly to the Union. He did, however, accept the Company's suggestion that the test battery and answer sheets be disclosed to an expert intermediary. Disclosure of these materials to lay Union representatives, he reasoned, would not be likely to produce constructive results, since the tests could be properly analyzed only by professionals.[8] The Union was to be given "the right to see and study the tests," and to use the information therein "to the extent necessary to process and arbitrate the grievances," but not to disclose the information to third parties other than the arbitrator.

The Company specifically requested the Board "to adopt that part of the order which requires that tests be turned over to a qualified psychologist," but excepted to the requirement that the employee-linked scores be given to the Union. It contended that the only reason asserted by the Union in support of its request for the scores—to check their arithmetical accuracy—was not sufficient to overcome the principle of confidentiality that underlay its psychological testing program. The Union filed a cross exception to the requirement that it select a psychologist, arguing that it should not be forced to "employ an outsider for what is normal grievance and Labor-Management work."

The Board, and the Court of Appeals for the Sixth Circuit in its decision enforcing the Board's order, ordered the Company to turn over all the material directly to the Union. They concluded that the Union should be able to determine for itself whether it needed a psychologist to interpret the test battery and answer sheets. Both recognized the Company's interest in maintaining the security of the tests, but both

---

[8] The Company had consistently maintained that disclosure to the Union would serve no purpose. It contended that the validity of the tests depended upon a statistical determination that they were accurate predictors of future job performance. Lay examination of the questions, it asserted, could only determine whether the questions were on their face related to the job.

reasoned that appropriate restrictions on the Union's use of the materials would protect this interest.[9]  Neither was receptive to the Company's claim that employee privacy and the professional obligations of the Company's industrial psychologists should outweigh the Union request for the employee-linked scores.

## II

Because of the procedural posture of this case, the questions that have been preserved for our review are relatively narrow. The Company has presented a lengthy argument designed to demonstrate that the Board and the Court of Appeals misunderstood the premises of its aptitude testing program and thus erred in concluding that the information requested by the Union would be of any actual or potential relevance to the performance of its duties.  This basic challenge, insofar as it concerns the test battery and answer sheets, is foreclosed, however, by § 10 (e) of the Act because of the Company's failure to raise it before the Board.[10]

---

[9] The Board, although it ordered the Company to supply the tests and answer sheets directly to the Union, incorporated by reference the Administrative Law Judge's restrictions on the Union's use of the materials.  Under those restrictions, the Union was given the right "to use the tests and the information contained therein to the extent necessary to process and arbitrate the grievances, but not to copy the tests, or otherwise use them for the purpose of disclosing the tests or the questions to employees who have in the past, or who may in the future take these tests, or to anyone (other than the arbitrator) who may advise the employees of the contents of the tests."

After the conclusion of the arbitration, the Union was required to return "all copies of the battery of tests" to the Company. The Court of Appeals, in enforcing the Board's order, stated that the "restrictions on use of the materials and obligation to return them to Detroit Edison are part of the decision and order which we enforce." 560 F. 2d 722, 726.

[10] 29 U. S. C. § 160 (e).  Section 10 (e) precludes a reviewing court from considering an objection that has not been urged before the Board, "unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."  The Board enforces a similar procedural

Two issues, then, are presented on this record. The first concerns the Board's choice of a remedy for the Company's failure to disclose copies of the test battery and answer sheets. The second, and related, question concerns the propriety of the Board's conclusion that the Company committed an unfair labor practice when it refused to disclose, without a written consent from the individual employees, the test scores linked with the employee names.

## A

We turn first to the question whether the Board abused its remedial discretion when it ordered the Company to deliver

---

limitation through a rule providing that any exception to a finding of the Administrative Law Judge not specifically urged before the Board "shall be deemed to have been waived." 29 CFR § 102.46 (b) (1978). The rule serves a sound purpose, and unless a party's neglect to press an exception before the Board is excused by the statutory "extraordinary circumstances" exception or unless the Board determination at issue is patently in excess of its authority, we are bound by it. See, e. g., NLRB v. Ochoa Fertilizer Corp., 368 U. S. 318, 322.

The Company has justified its failure to object on the ground that it had "no practical reason" to challenge the portion of the Administrative Law Judge's recommendation adopting its suggestion that the tests and answer sheets be disclosed to an intermediary. If this ground were accepted as an "extraordinary circumstance," however, little would be left of the statutory exception. In any case, the Company's "practical" reason disappeared when it again failed to challenge the finding of relevance after the Union had filed a cross exception urging that direct disclosure be ordered.

Moreover, much of the Company's challenge to relevancy is based upon the arbitrator's findings and conclusion that examination of these materials would prove little. We do not question the arbitrator's interpretation of the collective agreement. Nonetheless, the parties agreed not to be bound by the arbitrator's determination of relevance, the arbitrator accepted this condition, and the Board concluded that the Union could properly invoke its jurisdiction on these terms. This is not to say that the arbitral award itself is irrelevant to this controversy. The arbitration record and award were before the Administrative Law Judge, and we do not understand the Board to have disturbed the arbitrator's resolution of the contract issues peculiarly within his competence. Cf. NLRB v. Acme Industrial Co., 385 U. S. 432, 436–437.

directly to the Union the copies of the test battery and answer sheets. The Company's position, stripped of the argument that it had no duty at all to disclose these materials, is as follows: It urges that disclosure directly to the Union would carry with it a substantial risk that the test questions would be disseminated. Since it spent considerable time and money validating the Instrument Man B tests and since its tests depend for reliability upon the examinee's lack of advance preparation, it contends that the harm of dissemination would not be trivial. The future validity of the tests is tied to secrecy, and disclosure to employees would not only threaten the Company's investment but would also leave the Company with no valid means of measuring employee aptitude. The Company also maintains that its interest in preserving the security of its tests is consistent with the federal policy favoring the use of validated, standardized, and non-discriminatory employee selection procedures reflected in the Civil Rights Act of 1964.[11]

---

[11] 42 U. S. C. § 2000e *et seq.* The Company places particular emphasis on § 703 (h) of Title VII, 42 U. S. C. § 2000e–2 (h), and the agency guidelines promulgated thereunder. Indeed, it has argued that the guidelines are violated by the Board's order directing disclosure to the employee representative. With this we cannot agree. Section 703 (h) permits an employer to "give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended, or used to discriminate because of race, color, religion, sex or national origin." Pursuant to § 703 (h), specific guidelines on employee testing programs have been issued. See Equal Employment Opportunity Comm'n, Guidelines on Employee Selection Procedures, 29 CFR § 1607.1 *et seq.* (1977). The guidelines state that "properly validated and standardized employee selection procedures can significantly contribute to the implementation of non-discriminatory personnel policies." § 1607.1 (a). In another section of the guidelines, it is stated that evidence of test validity must be based on "studies employing generally accepted procedures for determining criterion-related validity, such as those described in the 'Standards for Educational and Psychological Tests and Manuals' published by the

In his brief on behalf of the Board, the Solicitor General has acknowledged the existence of a strong public policy against disclosure of employment aptitude tests and, at least in the context of civil service testing, has conceded that "[g]overnmental recruitment would be seriously disputed and public confidence eroded if the integrity of . . . tests were compromised." Indeed, he has also acknowledged that the United States Civil Service Commission "has been zealous to guard against undue disclosure and has successfully contended for protective orders which limit exposure of the tests to attorneys and professional psychologists with restrictions on copying or disseminating test materials." He urges, however, that the Board's order can be justified on the grounds that the Union's institutional interests militate against improper disclosure, and that the specific protective provisions in the Board's order will safeguard the integrity of the tests.[12] He emphasizes the deference generally accorded to "the considered judgment of the Board, charged by Congress with special responsibility for effectuating labor policy." We do not find these justifications persuasive.

A union's bare assertion that it needs information to process a grievance does not automatically oblige the employer to supply all the information in the manner requested. The duty to supply information under § 8 (a)(5) turns upon "the circumstances of the particular case," *NLRB* v. *Truitt Mfg. Co.*, 351 U. S., at 153, and much the same may be said for

American Psychological Association." § 1607.5. The guidelines further provide that "[t]ests must be administered and scored under controlled and standardized conditions, with proper safeguards to protect the security of tests scores." § 1607.5 (b)(2). Contrary to the Company's assertion, these provisions, although they do recognize the relationship between test security and test validity, do not insulate testing materials from the employer's duty under the Act to disclose relevant information. At most, they provide evidence of the employer's interest in maintaining the security of properly validated tests.

[12] See n. 9, *supra*.

the type of disclosure that will satisfy that duty. See, *e. g.*, *American Cyanamid Co.*, 129 N. L. R. B. 683, 684 (1960). Throughout this proceeding, the reasonableness of the Company's concern for test secrecy has been essentially conceded. The finding by the Board that this concern did not outweigh the Union's interest in exploring the fairness of the Company's criteria for promotion did not carry with it any suggestion that the concern itself was not legitimate and substantial.[13] Indeed, on this record—which has established the Company's freedom under the collective contract to use aptitude tests as a criterion for promotion, the empirical validity of the tests, and the relationship between secrecy and test validity—the strength of the Company's concern has been abundantly demonstrated. The Board has cited no principle of national labor policy to warrant a remedy that would unnecessarily disserve this interest, and we are unable to identify one.

It is obvious that the remedy selected by the Board does not adequately protect the security of the tests. The restrictions barring the Union from taking any action that might cause the tests to fall into the hands of employees who have taken or are likely to take them are only as effective as the sanctions available to enforce them. In this instance, there is substantial doubt whether the Union would be subject to a contempt citation were it to ignore the restrictions. It was not a party to the enforcement proceeding in the Court of Appeals, and the scope of an enforcement order under § 10 (e) is limited by Fed. Rule Civ. Proc. 65 (d) making an injunction binding only "upon the parties to the action . . . and

---

[13] The Board limited discussion of its reasons for eliminating the intermediary requirement to the statement that "it is reasonable to assume that, having requested the papers, the Union intends effectively to utilize them." Consequently, it said, it "would not condition the Union's access to the information on the retention of a psychologist but rather would have [the Company] submit the information directly to the Union and let the Union decide whether the assistance or expertise of a psychologist is required."

upon those persons in active concert or participation with them . . . ." See *Regal Knitwear Co.* v. *NLRB,* 324 U. S. 9, 14. The Union, of course, did participate actively in the Board proceedings, but it is debatable whether that would be enough to satisfy the requirement of the Rule. Further, the Board's regulations contemplate a contempt sanction only against a respondent, 29 CFR §§ 101.9, 101.14–101.15 (1978), and the initiation of contempt proceedings is entirely within the discretion of the Board's General Counsel. *Utility Workers* v. *Consolidated Edison Co.,* 309 U. S. 261, 269. Effective sanctions at the Board level are similarly problematic. To be sure, the Board's General Counsel could theoretically bring a separate unfair labor practice charge against the Union, but he could also in his unreviewable discretion refuse to issue such a complaint. See 29 U. S. C. § 153 (d) ; *Vaca* v. *Sipes,* 386 U. S. 171, 182. Moreover, the Union clearly would not be accountable in either contempt or unfair labor practice proceedings for the most realistic vice inherent in the Board's remedy—the danger of inadvertent leaks.

We are mindful that the Board is granted broad discretion in devising remedies to undo the effects of violations of the Act, *NLRB* v. *Seven-Up Bottling Co.,* 344 U. S. 344, 346; *Fibreboard Corp.* v. *NLRB,* 379 U. S. 203, 216, and of the principle that in the area of federal labor law "the relation of remedy to policy is peculiarly a matter for administrative competence." *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 194. Nonetheless, the rule of deference to the Board's choice of remedy does not constitute a blank check for arbitrary action. The role that Congress in § 10 (e) has entrusted to the courts in reviewing the Board's petitions for enforcement of its orders is not that of passive conduit. See *Fibreboard Corp.* v. *NLRB, supra,* at 216. The Board in this case having identified no justification for a remedy granting such scant protection to the Company's undisputed and important interests in test secrecy, we hold that the Board abused its dis-

cretion in ordering the Company to turn over the test battery and answer sheets directly to the Union.

## B

The dispute over Union access to the actual scores received by named employees is in a somewhat different procedural posture, since the Company did on this issue preserve its objections to the basic finding that it had violated its duty under § 8 (a)(5) when it refused disclosure. The Company argues that even if the scores were relevant to the Union's grievance (which it vigorously disputes), the Union's need for the information was not sufficiently weighty to require breach of the promise of confidentiality to the examinees, breach of its industrial psychologists' code of professional ethics, and potential embarrassment and harassment of at least some of the examinees. The Board responds that this information does satisfy the appropriate standard of "relevance," see *NLRB* v. *Acme Industrial Co.*, 385 U. S. 432, and that the Company, having "unilaterally" chosen to make a promise of confidentiality to the examinees, cannot rely on that promise to defend against a request for relevant information. The professional obligations of the Company's psychologists, it argues, must give way to paramount federal law. Finally, it dismisses as speculative the contention that employees with low scores might be embarrassed or harassed.

We may accept for the sake of this discussion the finding that the employee scores were of potential relevance to the Union's grievance, as well as the position of the Board that the federal statutory duty to disclose relevant information cannot be defeated by the ethical standards of a private group. Cf. *Nash* v. *Florida Industrial Comm'n*, 389 U. S. 235, 239. Nevertheless we agree with the Company that its willingness to disclose these scores only upon receipt of consents from the examinees satisfied its statutory obligations under § 8 (a)(5).

The Board's position appears to rest on the proposition that union interests in arguably relevant information must always predominate over all other interests, however legitimate. But such an absolute rule has never been established,[14] and we decline to adopt such a rule here.[15] There are situations in which an employer's conditional offer to disclose may be warranted. This we believe is one.

The sensitivity of any human being to disclosure of information that may be taken to bear on his or her basic competence is sufficiently well known to be an appropriate subject of judicial notice.[16] There is nothing in this record to

[14] See *Emeryville Research Center, Shell Development Co.* v. *NLRB,* 441 F. 2d 880 (CA9 1971) (refusal to supply relevant salary information in precise form demanded did not constitute violation of § 8 (a) (5) when company's proposed alternatives were responsive to union's need); *Shell Oil Co.* v. *NLRB,* 457 F. 2d 615 (CA9 1975) (refusal to supply employee names without employee consent not unlawful when company had well-founded fear that nonstriking employees would be harassed); cf. *Kroger Co.* v. *NLRB,* 399 F. 2d 455 (CA6 1968) (no disclosure of operating ratio data when, under circumstances, interests of employer predominated); *United Aircraft Corp.,* 192 N. L. R. B. 382, 390 (1971) (employer acted reasonably in refusing to honor generalized request for employee medical records without employee's permission), modified on other grounds, *Machinists* v. *United Aircraft Corp.,* 534 F. 2d 422 (CA2 1975).

[15] *NLRB* v. *Wyman-Gordon Co.,* 394 U. S. 759, relied upon by the Solicitor General, is not to the contrary. The interests at stake and the legal issues involved in that case, in which the Board ordered the company to disclose the names and addresses of employees to a union in the process of an organizing campaign, were far different from those involved here.

[16] A person's interest in preserving the confidentiality of sensitive information contained in his personnel files has been given forceful recognition in both federal and state legislation governing the recordkeeping activities of public employers and agencies. See, *e. g.,* Privacy Act of 1974, 5 U. S. C. § 552a (written consent required before information in individual records may be disclosed, unless the request falls within an explicit statutory exception); Colo. Rev. Stat. § 24-72-204 (3) (a) (1973) (regulating disclosure of medical, psychological, and scholastic achievement data in public records); Iowa Code Ann. §§ 68A.7 (10)–(11) (West 1973) (regulating disclosure of personal information in public

suggest that the Company promised the examinees that their scores would remain confidential in order to further parochial concerns or to frustrate subsequent Union attempts to process employee grievances. And it has not been suggested at any point in this proceeding that the Company's unilateral promise of confidentiality was in itself violative of the terms of the collective-bargaining agreement. Indeed, the Company presented evidence that disclosure of individual scores had in the past resulted in the harassment of some lower scoring examinees who had, as a result, left the Company.

Under these circumstances, any possible impairment of the function of the Union in processing the grievances of employees is more than justified by the interests served in conditioning the disclosure of the test scores upon the consent of the very employees whose grievance is being processed. The burden on the Union in this instance is minimal. The Company's interest in preserving employee confidence in the testing program is well founded.

In light of the sensitive nature of testing information, the minimal burden that compliance with the Company's offer would have placed on the Union, and the total absence of

employee records); N. Y. Pub. Off. Law §§ 89 (2) (b) (i)–(c) (ii) (McKinney Supp. 1978) (disapproving unconsented-to release of employment and medical information in public records). See also U. S. Privacy Protection Study Comm'n, Personal Privacy in an Information Society (1977) (recommending that all employers should be under a duty to safeguard the confidentiality of employee records). Cf. Family Educational Rights and Privacy Act of 1974, 20 U. S. C. § 1232g (explicitly recognizing, in the context of education, the interest of the individual in maintaining the confidentiality of test scores). Indeed, the federal Privacy Act ban on unconsented-to disclosure of employee records without written consent has been construed to provide a valid defense to a union request for certain employee personnel data made pursuant to the terms of a public employee collective-bargaining agreement. See *American Federation of Govt. Employees* v. *Defense General Supply Center*, 423 F. Supp. 481 (ED Va. 1976), aff'd *per curiam*, 573 F. 2d 184 (CA4 1978).

evidence that the Company had fabricated concern for employee confidentiality only to frustrate the Union in the discharge of its responsibilities, we are unable to sustain the Board in its conclusion that the Company, in resisting an unconsented-to disclosure of individual test results, violated the statutory obligation to bargain in good faith. See *NLRB v. Truitt Mfg. Co.*, 351 U. S. 149. Accordingly, we hold that the order requiring the Company unconditionally to disclose the employee scores to the Union was erroneous.

The judgment is vacated, and the case remanded to the Court of Appeals for the Sixth Circuit for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS, concurring in part and dissenting in part.

This is a close case on both issues. With respect to the test battery and answer sheets, I agree with MR. JUSTICE WHITE that we should respect the Board's exercise of its broad remedial discretion. On the other hand, I agree with the Court that the Union should not be permitted to invade the individual employees' interest in the confidentiality of their test scores without their consent. Accordingly, I join all but Part II–A of the Court's opinion and also join Part I of MR. JUSTICE WHITE's dissent.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, and with whom MR. JUSTICE STEVENS joins as to Part I, dissenting.

The Court today disapproves enforcement of an order of the National Labor Relations Board essentially on the theory that the order fails to accommodate properly the competing interests of the Union, individual employees, and the employer. We have formerly stressed, however, that " 'balancing . . . conflicting legitimate interests . . . to effectuate na-

tional labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.' " *Beth Israel Hospital* v. *NLRB,* 437 U. S. 483, 501 (1978), quoting *NLRB* v. *Truck Drivers,* 353 U. S. 87, 96 (1957). Because I perceive no warrant to disturb the balance the Board has struck in this case, I dissent.

## I

As the Court holds, the relevance of the test questions and answer sheets to the performance of the Union's statutory duties is established for present purposes by the Company's failure to press the issue properly before the Board. The Court, moreover, does not explicitly upset the Board's determination that the Company's failure to release those materials to the Union amounted to an unfair labor practice. The only issue here regarding the test questions and answer sheets is "whether the Board abused its *remedial* discretion when it ordered the Company to deliver directly to the Union the copies of the test battery and answer sheets." *Ante,* at 312–313 (emphasis added). If, however, the basic impropriety of the Company's failure to divulge the materials to the Union is settled, the Board's *remedial* authority to compel conditional disclosure is abundantly clear. The Court is quite wrong in holding that the Board's order exceeded the agency's "broad discretionary [remedial power]." *Fibreboard Corp.* v. *NLRB,* 379 U. S. 203, 216 (1964). For it is too well established that a decree fashioned by the Board to remedy violations of the Act "will not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " *Ibid.,* quoting *Virginia Elec. & Power Co.* v. *NLRB,* 319 U. S. 533, 540 (1943).

The Court nevertheless asserts that the Board erred in directing the Company to release the test questions and

answer sheets directly to the Union with no more formal assurance that secrecy will be preserved than that afforded by the Board's protective order. Release to the Union, it is said, risks imminent general disclosure without any apparent justification. Presumably, the test questions and answer sheets ought to be divulged to a psychologist instead. In so concluding, the majority—in my view—unduly discounts the Board's own appraisal of the jeopardy to the Company's interests and of the substantiality of countervailing concerns.

## A

The Board ordered release of the test questions and answer sheets only on condition that the Union preserve their secrecy. Specifically, the Union was admonished not to copy the materials or to make them available to potential test takers or to others who might advise the employees of their content. The Court scoffs at the order, however, on the ground that "there is substantial doubt whether the Union would be subject to a contempt citation were it to ignore the restrictions." *Ante,* at 315.[1]  But the Board placed no reliance on contempt sanc-

---

[1] The Court suggests that the Court of Appeals' order cannot reach the Union because the order as it affects the Union is not literally within the compass of Fed. Rule Civ. Proc. 65 (d).  But the policy underlying Rule 65 (d) is that of not having " 'order[s] or injunction[s] so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law.' " *Golden State Bottling Co.* v. *NLRB,* 414 U. S. 168, 180 (1973), quoting *Regal Knitwear Co.* v. *NLRB,* 324 U. S. 9, 13 (1945); see *United States* v. *Hall,* 472 F. 2d 261 (CA5 1972).  Cf. *United States* v. *New York Tel. Co.,* 434 U. S. 159, 171–178 (1977).  Here, the Union was a party to the administrative proceedings, the Union's rights were adjudicated therein, it had the opportunity to secure judicial review of the terms subsequently enforced, it had notice that enforcement would be requested, it doubtless has notice of the terms of the enforcement order itself, and extension of the order to reach the Union is urged to ensure that the Court of Appeals' determination of the cognizability and scope of the Union's right of access will be fully respected. Thus, the Union is in practical effect as much a party as any typical de-

tions when it directed release, and there is scant reason for rejecting the Board's judgment that sanctions of that sort are unnecessary. The Board, in my view, had forceful and independent grounds for concluding that the Union would respect the confidentiality of the materials and take due precautions against inadvertent exposure.

The Union has enjoyed a long and extensive relationship with the employer[2] that it would be loath to jeopardize by intentionally breaching the conditions of release. Cf. *Fawcett Printing Corp.*, 201 N. L. R. B. 964, 974 (1973). Even if the Union had any incentive to publicize the examination questions, its ardor would be dampened by the likely long-term consequences of that course; the Board exercises continuing authority over the Union's affairs, and it may well approve the Company's future insistence on rigorous secrecy, thus delimiting the Union's subsequent latitude in grievance processing.[3] Moreover, dissemination of test materials to potential test takers might impair the interests of those employees who qualify fairly for a desired position, thus inviting their disapprobation.[4]

---

fendant who has been given an opportunity to be heard but who has declined to avail itself of that opportunity.

The Court speculates, however, that the Board would not initiate contempt proceedings in the event of Union disclosure. That observation assumes without basis that the Board would acquiesce in the Union's disregard of the Board's own directives.

[2] The Union has been the certified representative of the Company's employees since about 1943, in approximately 28 different bargaining units. The Union was first certified by the Board in 1971 as the representative of operating and maintenance employees of the production department of the Monroe Power Plant, wherefrom this controversy arose.

[3] The Union's disregard of the conditions of release may also violate the Union's duty to bargain in good faith under § 8 (b)(3) of the Act, 29 U. S. C. § 158 (b)(3), Comment, Psychological Aptitude Tests and the Duty to Supply Information: *NLRB v. Detroit Edison Co.*, 91 Harv. L. Rev. 869, 876 n. 49 (1978), subjecting the Union to appropriate sanctions.

[4] By prejudicing the interests of such employees and by eroding its bargaining relationship with the employer, the Union may provoke its own

The Company acknowledges, in any event, see Tr. of Oral Arg. 12, and the Court agrees, see *ante,* at 316, that the real concern is with inadvertent disclosure. Yet there is no basis for assuming that the Union would handle the materials so cavalierly as to chance accidental disclosure, given the gravity with which the issue has been treated by all concerned. Thus, in the circumstances of this case, the Board had ample grounds to expect Union cooperation. And this Court is ill-equipped to fault the Board on a matter so plainly summoning the Board's keen familiarity with industrial behavior.

## B

Besides overrating the hazards of direct release to the Union of the test questions, the Court undervalues the interests vindicated by that procedure. The Court asserts simply that the "Board has cited no principle of national labor policy to warrant a remedy that would unnecessarily disserve [the Company's interest in maintaining secrecy], and we are unable to identify one." *Ante,* at 315. The Board observed in its decision, however, that "[a]s the bargaining agent of the employees involved, it is the Union which is entitled to information which is necessary to its role as bargaining agent in the administration of the collective-bargaining agreement." 218 N. L. R. B. 1024 (1975). The employer's "accommodation"—releasing the test questions solely to a psychologist—which the Court tacitly endorses, is fundamentally at odds with the basic structure of the bargaining process. Congress has conferred paramount representational responsibilities and obligations on the employees' freely chosen bargaining agent. Yet the Company's alternative would install a third-party psychologist as a partner, if not primary actor, in promotion-related grievance proceedings.

---

ouster by disgruntled members of the bargaining unit. In certain circumstances, the Union's action might also invite unfair-representation suits by employees who are clearly disadvantaged by the disclosure.

The services of a professional psychologist, furthermore, may be totally unnecessary. Suspected difficulties with the test questions may necessitate consultation with a psychologist, but resort to such assistance is not so foreordained as to justify compulsory retention of a psychologist as a condition to availability of materials pertinent to the processing of a grievance. In fact, the attendant expense may well encourage the Union to forgo requesting the information, despite its potential utility. Confronted with these concerns, the Board reasonably undertook to ensure that primary responsibility for grievance evaluation and processing remains where Congress put it, and that the Union's access to pertinent information remains unimpeded by cumbersome or prohibitive obstacles.

## II

The Court further concludes that the Company properly declined to disclose the examinees' test scores, associated with the employees' names, absent consent by the examinees themselves.[5] In the majority's view, the Board accorded too little

---

[5] The Court assumes for the sake of discussion that the identified test scores are relevant to the performance of the Union's statutory duties. I think that assumption is well founded. The test of relevance for purposes of the duty to disclose is a liberal "discovery-type standard." *NLRB* v. *Acme Industrial Co.*, 385 U. S. 432, 437 (1967). The scores unquestionably satisfy that standard, as they possess a substantial bearing on the issue whether the employer's reliance on test performance denied the aggrieved employees their contractual right to be appointed as Instrument Man unless outshone by less senior applicants with significantly superior qualifications.

As the Administrative Law Judge noted, the Union needs access to the test scores, identified by the examinees' names, in order to police the contract, 218 N. L. R. B. 1024, 1034 (1975). The information would enable the Union to detect abuses in the administration of the tests and, because the examination papers—eliciting multiple-choice responses—were graded manually, grading errors are not improbable and are susceptible of detection by a Union representative. See *id.*, at 1027, 1034.

Moreover, inspection of the examinees' results might disclose unacceptable biases in the tests themselves. Inspection of test scores and the

weight to the interests of individual employees in the confidentiality of their test results and too much significance to the "minimal" burden on the Union that would result from a consent requirement. In this respect, too, the Court inappropriately substitutes its judgment for the reasonable determination of the Board.

Preliminarily, it is notable that the confidentiality of the test results was significantly compromised by circumstances

---

personal characteristics of the employees tested might reveal that certain employees are encountering difficulties with the tests for reasons unrelated to job aptitude. Put another way, the margin of error inhering in the examination may be assignable to test biases identifiable with the aid of the examinees' answer sheets. See Comment, 91 Harv. L. Rev., *supra* n. 3, at 873–874.

The utility of such information in determining whether the test battery fairly measures job aptitude in particular instances is illustrated by the following colloquy between the arbitrator and an expert witness in the Company's employ:

"THE ARBITRATOR: I guess what I am wondering about in this kind of a test is when you grade these, you are just . . . taking the raw score and not looking at what might be the elements in the test. Is that right?

"THE WITNESS: No. We would look at the elements of the test. We always look at the parts of the test because sometimes a performance on a particular kind of segment of any test might indicate that we have a bad testing situation; this person really didn't have an opportunity to do what he is capable of doing, and you then can find out that, for example, a person's native language might not be English and that might account for the peculiar thing and you would then not even perhaps score the test.

"THE ARBITRATOR: How would you see that? How would you find that data?

"THE WITNESS: Well, you would see it because this particular test has, for example, several different elements tapping different kinds of abilities, some based on verbal use of language and some not so heavily weighted in that direction, and you would see a pronounced difference which is completely out of character. It just doesn't fit.

"This is what normally happens when given the test. A test is an overall look at engineering and physical science aptitudes. That is a rather closely-knit set, and if one of the tests were way off, one might then legitimately ask whether or not you had a good test overall." App. 324–325.

independent of the Board's disclosure order at issue herein. The Union, and the employees generally, were aware that the 10 aggrieved job applicants received scores below 10.3—the cutoff point. Moreover, in consequence of the arbitrator's ruling, it became generally evident that 3 of the 10 applicants had earned scores falling between 9.3 and 10.3 and that the remaining 7 had scored below 9.3. See 218 N. L. R. B., at 1032. Thus, the real question here is whether the Board was unreasonable in concluding that the marginal intrusion on confidentiality accompanying full disclosure to the Union was so profound as to require the withholding of that information from the statutory bargaining representative.

Significantly, the employer has presented no evidence that the employees involved actually oppose disclosure. Nor has the Company demonstrated any palpable basis for believing that release will result in harassment or ridicule of the examinees. Cf. *United Aircraft Corp.* v. *NLRB*, 434 F. 2d 1198, 1207 (CA2 1970), cert. denied, 401 U. S. 993 (1971). The Court notes that "the Company presented evidence that disclosure of individual scores had in the past resulted in the harassment of some lower scoring examinees who had, as a result, left the Company." *Ante*, at 319. But that evidence consisted of an isolated representation by a Company psychologist concerning events occurring "many, many years ago." App. 84. And the Administrative Law Judge evidently dismissed the account in concluding that the Company had "produced no probative evidence that the employees' sensitivities are likely to be abused by disclosure of the scores." 218 N. L. R. B., at 1035.[6] When an employer resists the

---

[6] There is no reason to believe, moreover, that release of the scores to the Union will result in dissemination to the employees generally. The Union has no incentive, and indeed would be foolish, to publicize test information against the wishes of an actual or potential member of the bargaining unit. Furthermore, the Board's order may reasonably be read to restrict the divulgence and use of the test scores as well as the test questions.

divulgence of materials relevant to employee grievances, I would think that the employer has the burden of establishing any justification for nondisclosure. The Court, however, presumes what yet remains to be shown.

Moreover, there is no basis in the governing statute or regulations for attributing ascendant importance to the employees' confidentiality interests. Whether confidentiality considerations should prevail in the circumstances of this case is, as the Company and majority agree, principally a matter of policy. But it cannot be gainsaid that the Board is the body charged in the first instance with the task of discerning and effectuating congressional policies in the labor-management area. Its judgments in that regard should not be lightly overturned. Yet the Court strikes its own balance according decisional weight to concerns having no asserted or apparent foundation in the statute it purports to construe or in other applicable legislation.

The Court lightly dismisses the Union's interest in receipt of the examinees' identified scores, with or without consent, by declaring the burdens involved as "minimal." *Ante,* at 319. The Administrative Law Judge noted, however, that the "Union's obligation is to represent the unit of employees as a whole[; the Company] may not frustrate this by requiring the Union to secure the consent of individuals in the unit in order to secure information relevant and reasonably necessary to the enforcement of the collective-bargaining agreement which exists for the benefit of all." 218 N. L. R. B., at 1036.[7]

---

[7] Even an individual employee cannot press his own grievance in such a way as to frustrate the Union's responsibility to ensure fairness to all members of the bargaining unit. Although an individual employee has the statutory right to present a grievance at any time to his employer, "the bargaining representative [must be] given opportunity to be present at such adjustment." § 9 (a) of the Act, 29 U. S. C. § 159 (a). The Company's policy to have its psychologist explain an examinee's score to him when the examinee has failed to make the cutoff, see *ante,* at 307, but

Were individual examinees to withhold consent, and thus prevent the Union from scrutinizing their scores in light of their demographic and occupational characteristics, the Union might be inhibited in its efforts to discern patterns or anomalies indicating bias in the operation of the tests.[8]  Thus, the Board directed divulgence of the scores to the employees' statutory bargaining representative to enable it effectively to fulfill its vital statutory functions.  Such a limited intrusion, cf. *Whalen* v. *Roe,* 429 U. S. 589, 602 (1977), for the purpose of vindicating grave statutory policies, hardly signals an occasion for judicial intervention.[9]

---

not to disclose the same information to the Union, is directly inconsistent with the mandate of § 9 (a).  As the Administrative Law Judge observed:

"In essence, [the employer] here contends that, having voluntarily chosen a particular form or mechanism to determine the right of bargaining unit employees to be promoted, [the employer] is now precluded by the very devices which it adopted from dealing with the employees' bargaining representative about critical elements of the promotion process, and will deal only with the individual.  Such a program, which freezes out the bargaining representative from participation in significant elements of the promotion process, and seeks to substitute individual bargaining therefor constitutes a complete negation of the bargaining process . . . ." 218 N. L. R. B., at 1035.

[8] Release of the information to a psychologist alone would be unsatisfactory.  See *supra,* at 324–325.  The Union would be relegated " 'to play[ing] a game of blind man's bluff.' "  *NLRB* v. *Acme Industrial Co.,* 385 U. S., at 438 n. 8, quoting *Fafnir Bearing Co.* v. *NLRB,* 362 F. 2d 716, 721 (CA2 1966).

[9] In other contexts, the courts have generally rejected claims of confidentiality as a basis for withholding relevant information.  See *General Electric Co.* v. *NLRB,* 466 F. 2d 1177 (CA6 1972) (wage data); *NLRB* v. *Frontier Homes Corp.,* 371 F. 2d 974 (CA8 1967) (selling-price lists); *Curtiss-Wright Corp.* v. *NLRB,* 347 F. 2d 61 (CA3 1965) (job evaluation and wage data); *NLRB* v. *Item Co.,* 220 F. 2d 956 (CA5) (wage data), cert. denied, 350 U. S. 836 (1955); cf. *United Aircraft Corp.,* 192 N. L. R. B. 382, 390 (1971) (company physician's records not disclosable without employee's permission unless needed for a particular grievance), modified on other issues *sub nom. Machinists* v. *United Aircraft Corp.,* 534 F. 2d 422 (CA2 1975), cert. denied, 429 U. S. 825 (1976); *Shell Oil Co.* v. *NLRB,*

## III

In sum, I think the Board's resolution is sound and that the Sixth Circuit's judgment enforcing it should be sustained. I do not mean to suggest that the considerations advanced by the Company are without substance or that this case does not present a "difficult and delicate" task of balancing competing claims. Cf. *Beth Israel Hospital* v. *NLRB*, 437 U. S., at 501. But, by virtue of that, this is precisely the kind of case in which "considerable deference" is owed the Board. *NLRB* v. *Iron Workers*, 434 U. S. 335, 350 (1978); see *NLRB* v. *Insurance Agents*, 361 U. S. 477, 499 (1960); *NLRB* v. *Truck Drivers*, 353 U. S., at 96. Importantly, "[h]ere, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life, . . . and of '[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases' from

457 F. 2d 615, 619 (CA9 1972) (refusal to furnish employees' names without consent was proper when it was "establish[ed] beyond cavil that there was a clear and present danger of harassment and violence"). See also *Cowles Communications, Inc.*, 172 N. L. R. B. 1909 (1968) (employees' salaries and other particularized data about employees); *Electric Auto-Lite Co.*, 89 N. L. R. B. 1192 (1950) (wage data); R. Gorman, Labor Law 417–418 (1976); Comment, 91 Harv. L. Rev., *supra* n. 3, at 873–874, and n. 35. In *NLRB* v. *Wyman-Gordon Co.*, 394 U. S. 759 (1969), in another setting, a plurality of this Court observed:

"The disclosure requirement [imposed by the Board and concerning employees' names and addresses] furthers [statutory objectives] by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses. It is for the Board and not for this Court to weigh against this interest the asserted interest of employees in avoiding the problems that union solicitation may present." *Id.*, at 767.

*American Federation of Govt. Employees* v. *Defense General Supply Center*, 573 F. 2d 184 (CA4 1978), from which the majority seeks support, *ante*, at 319 n. 16, involved a federal employer not subject to the National Labor Relations Act and a construction of the federal Privacy Act.

its special understanding of 'the actualities of industrial relations.' " *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 236 (1963), quoting *NLRB* v. *Steelworkers*, 357 U. S. 357, 362–363 (1958). I think it unjustified to depart from our accustomed mode of review. Accordingly, I respectfully dissent.