**LOCAL 900, UNITED PAPERWORKERS INTERNATIONAL UNION and United Paperworkers International Union, Plaintiffs,**

v.

**BOISE CASCADE CORPORATION, Defendant.**

**Civ. No. 87–0067–P.**

United States District Court,
D. Maine.

May 19, 1989.

See also 683 F.Supp. 280.

Timothy L. Belcher, Patrick N. McTeague, Jeffrey Neil Young, McTeague Higbee Libner, Topsham, Me., for plaintiffs.

John T. Salburg, Boise Cascade Corp., Boise, Idaho, Andrew M. Horton, Verrill & Dana, Portland, Me., David Fourtney, Morgan Lewis & Bockius, Philadelphia, Pa., for defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

This action, seeking relief under section 301 of the National Labor Relations Act, 29 U.S.C. § 185, for alleged breaches of a hiring moratorium agreement and a good faith agreement, was tried to the Court on February 21 and 22, 1989. The facts, many of which have been stipulated to by the parties, are as follow.

For many years, Plaintiffs [the Union] have represented production and maintenance employees at Defendant Boise Cascade Corporation's (Boise's) Rumford, Maine paper mill. In June 1986 the contract negotiations broke down and the Union began a strike which lasted from July 1 until September 14, 1986, when a new collective bargaining agreement was signed. On July 21, 1986, Boise unilaterally implemented in part its final offer to the Union.

During the strike, Boise hired persons to replace striking members of the Plaintiff Unions. The hiring procedure included screening and evaluation procedures. Successful candidates were eligible to be offered employment. Boise usually made the offers by telephone or in person, and the offeree could accept orally. The screening procedures included a drug test, and the policy of the company for several years had been that employment was contingent upon passing the drug screening, and specifically that offers of employment would not be made to an applicant until Boise had received satisfactory drug test results for that person. The hiring process was accelerated during the last week of the strike. Near the very end of the strike, Boise officials decided to offer employment to applicants whose drug test results had not been received. Beginning at about 7:00 a.m. on September 12, 1986, and continuing through that day, offers were made to and accepted by eighteen applicants whose drug screens were not complete. The results of the urine tests were received by Boise on Saturday, September 13, 1986. Prior to the offers being made on Friday, September 12, however, a blue sticker, indicating satisfactory drug and medical screening, had been placed on the files of all eighteen applicants. The hiring officers assumed when they made the offers that the drug screen had been completed.

At the request of Governor Brennan, the parties met in Augusta on September 11 and 12, 1986, to attempt to resolve the

strike. On Friday, September 12, the parties' representatives completed negotiation of a return-to-work agreement. The Union told Boise that the proposed agreement would be presented to Union members for consideration over the weekend. At about 3:00 p.m. Friday, Gary Cook, a Union representative, asked Boise to suspend hiring of replacement workers until the Union members had had an opportunity to vote on the return-to-work agreement. Because such a suspension could not be implemented immediately, the parties agreed that

> (1) effective 5 p.m. Friday, September 12, 1986, Defendant would suspend hiring of replacement workers to fill positions previously occupied by striking members of Plaintiff Unions; (2) the suspension would last up to 48 hours, i.e., to 5 P.M. Sunday, September 14, 1986, at which point Defendant was free to resume replacement hiring, unless prohibited by other agreements between the parties then in effect.

Revised Stipulation, ¶ 22. At no time during the discussions leading to this agreement did the parties have any discussion regarding a definition of the term "hiring."

Defendant continued to screen and evaluate job applicants during the moratorium period, but did not make any statements to any applicants purporting to constitute offers of employment after 5:00 p.m. Friday, September 12, 1986. By a secret ballot, the Union voted to accept the labor agreements, and it notified Boise of the acceptance on Sunday, September 14, 1986, at 1:07 p.m.

Following the end of the strike, striking workers who had not been permanently replaced returned to work. The eighteen workers, whose drug test results had not been received but who had orally accepted employment on Friday, September 12, were placed on the payroll as permanent replacements for seventeen striking workers.

The first issue presented is whether Boise breached the hiring freeze agreement. The Union argues that Boise did so by accepting drug screen results of eighteen persons on Saturday, because that action resulted in the "hiring" of permanent replacements for striking Union members. The Court disagrees, finding that the eighteen workers who are the subject of dispute here had been hired as permanent replacements for the strikers before the hiring freeze went into effect at 5:00 p.m. on September 12, 1986.

Boise was entitled to replace the economic strikers. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). It was also entitled to set the conditions of employment for the replacement workers without negotiating with the Union. *Times Publishing Co.*, 72 NLRB 676, 684 (1947); *Capitol–Husting Co., Inc. v. NLRB*, 671 F.2d 237 (7th Cir. 1982). Thus, although a four-phase process culminating with a medical drug screening had been used at the beginning of the strike to determine eligibility for employment as a permanent replacement, Boise had the right to change this procedure.

The record makes plain that Boise did indeed change the terms of employment of replacement workers on the last day of the strike when it began to offer employment to replacement workers without requiring that they first have passed the drug screen. Just the fact that the change was implemented indicates that Boise intended that employment would be effective upon acceptance of the offer, even without receipt of the drug screen results. This finding is bolstered by the fact that the Boise personnel charged with making employment offers to permanent replacements were provided files indicating that the applicants had already passed the medical and drug screens. There is no evidence that the offerees understood anything different or that they understood their acceptances to be conditional in any respect.[1] Given the

---

1. Ms. Gautier, the person in charge of physical exams during the strike, testified that she believed Boise had discussed with the permanent replacements the fact that offers of employment were being made despite the lack of drug screen results. Tr. 125. She did not remember what had been said, *id.*, and from her later testimony the Court infers that she did not tell the applicants about the change in the drug test procedure, but she believed the physician had told

"mutual understanding of employment" between Boise and the offerees at the time they tendered their acceptances on Friday, September 12, *see H. & F. Binch Co. v. NLRB*, 456 F.2d 357, 362 (2d Cir.1972), the Court finds that the eighteen permanent replacement workers discussed in this case had been hired before the hiring freeze went into effect at 5:00 p.m. on Friday, September 12.[2] Since the Union has not alleged that any individuals other than the eighteen mentioned above were hired during the hiring freeze, no violation occurred.

■ Plaintiffs also allege that by not disclosing that it had changed its procedure of offering employment only to those who passed the drug screen, Defendant breached an agreement to exercise good faith in the administration of its responsibilities. At trial, Gary Cook, the Union's International Representative who had participated in the September 12 negotiations, testified:

> [Good faith] was talked about a number of times, the union had some concern over good faith, and the lack of what we call grievability of the labor agreement under the changes that were going to be made in the new labor agreement. The company offered some language in the return to work agreement which dealt with grievability and good faith, and further we were told by Duane Johnson that he personally would be available to make sure that all issues—the return to work, the contract, and other issues that we felt were relevant would be handled in good faith by the company, that he would supervise that himself.

Tr. 42. This testimony does not establish the existence of an enforceable contract requiring Boise to act in good faith. It lacks specificity and does not set forth all the necessary elements of a contract, including, for example, consideration.

■ The Union also has cited *Reid v. Key Bank*, 821 F.2d 9, 12 (1st Cir.1987), in which the Court of Appeals found an actionable implied covenant of good faith and fair dealing under Maine law in the performance and enforcement of contracts. It is plain that "the Company's conduct in allegedly concealing from the Union the fact that it offered employment on Friday to applicants who were not yet eligible," Plaintiffs' Post–Trial Brief at 11, took place during the negotiation phase of the hiring freeze contract rather than the performance or enforcement phase. Neither *Reid* nor the provisions of contract law upon which it is based, *Restatement (Second) of Contracts* § 205 and Uniform Commercial Code, 11 M.R.S.A. § 1–203, establish a good-faith requirement in the negotiation of contracts.

Plaintiff also complains that Boise's acceptance of the drug screen results during the hiring freeze was not in good faith. The Court has already determined, however, that acceptance of the results did not constitute hiring, and that in fact, on this record, the significance of the drug test results for the newly hired permanent replacements was not established.

Finally, the Court notes that Boise had no independent duty to disclose the change in its hiring procedures, violation of which might be construed also as a breach of a duty of good faith. During negotiations "[t]he general rule is that an employer must supply, *on request*, 'relevant informa-

---

them. Tr. 132–33. There is, therefore, no record of what, if anything, the replacements were told. Certainly, the people offering the jobs did not tell them the employment was conditional on their passing the drug test, for they did not know the test had not already been passed. Tr. 98–101. Moreover, it is not clear from the record exactly what the status of the drug screen was after the procedures had been changed. Ms. Gautier testified that she did not know whether persons who had accepted employment and subsequently failed the drug screen would be able to work. Tr. 128. Mr. Peterson, the company's representative, also testified that he did not know if the rule requiring new employees to have satisfactory results from the drug screen had been suspended during the strike. Tr. 148.

**2.** The Union argues that determination of a breach of the hiring freeze agreement would be dependent on the meaning of the word "hiring" in that agreement. The Court finds, however, that no matter what the meaning of the term "hiring" was under the agreement, the eighteen workers at issue here were hired as permanent replacements before that agreement went into effect.

**30**

tion' 'in the employer's possession' 'needed by a labor union for the proper performance of its duties as the employees' bargaining representative.'" *Soule Glass and Glazing Co. v. NLRB,* 652 F.2d 1055, 1092 (1st Cir.1981) (emphasis added) (quoting *Detroit Edison Co., v. NLRB,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979)). During the negotiations on September 12, 1986, there was never a request by the Union for information on hiring procedures or the status of the drug test. Although Boise might have had a duty to bargain over the drug test in ordinary circumstances, as was discussed previously, its failure to do so when hiring permanent replacements was permissible. The Court, therefore, finds no breach of any good-faith obligation owed to the Union.

Accordingly, it is ORDERED that judgment be entered for the Defendant.