**LOUISIANA CHEMICAL ASSOCIATION**

v.

**Eula BINGHAM, Occupational Safety and Health Administration and Ray Marshall.**

**Columbus P. MILLET, Jr.**

v.

**Eula BINGHAM, Asst. Secy. of OSHA and Ray Marshall, Secy. of Labor.**

**Ronald P. CHAUFFE**

v.

**Eula BINGHAM, Asst. Secy. of OSHA, and Ray Marshall, Secy. of Labor.**

**Harry J. SMITH**

v.

**Eula BINGHAM, Asst. Secy. of OSHA and Ray Marshall, Secy. of Labor.**

Civ. A. Nos. 801178, 801201, 801200 and 801199.

United States District Court, W.D. Louisiana, Lake Charles Division.

Nov. 5, 1982.

Horace A. Thompson, Keith M. Pyburn, McCalla, Thompson, Pyburn & Ridley, New Orleans, La., Robert V. Zener, Richard B. Herzog, Pepper, Hamilton & Scheetz, Stephen A. Bokat, National Chamber Litigation Center, Inc., Washington, D.C., for plaintiffs.

James E. White, Regional Sol., Dallas, Tex., Nathaniel Spiller, U.S. Dept. of Labor, Washington, D.C., Joseph S. Cage, Jr., U.S. Atty., W.D. La., Shreveport, La., for defendants.

## MEMORANDUM RULING ON MOTIONS FOR SUMMARY JUDGMENT

VERON, District Judge.

Plaintiffs, Louisiana Chemical Association (hereinafter LCA), and three named employees of LCA members instituted this action on July 29, 1980, seeking declaratory and injunctive relief from two rules pro-

mulgated by the Occupational Safety and Health Administration (hereinafter OSHA). The contested rules are codified at 29 CFR §§ 1910.20 and 1913.10. The first rule, 29 CFR § 1910.20 (hereinafter "records access rule"), requires employers to provide their employees, OSHA, and designated employee representatives (typically unions) access to records voluntarily created by the employers which contain information relating to the medical and exposure histories of employees exposed to toxic substances or harmful physical agents. The second rule, § 1913.10 (hereinafter "internal procedures rule"), describes internal OSHA procedures to be followed to protect the privacy interest of employees in personally identifiable medical information released to OSHA.

On August 18, 1980, this court heard argument on plaintiffs' motions for preliminary injunctions and dismissed the case for lack of subject matter jurisdiction. The court at that time held that the records access rule was an "occupational safety and health standard" within the meaning of section 3(8) of the Occupational Safety and Health Act (hereinafter "the Act"), 29 U.S.C. § 652(8), and as such, was reviewable only directly in a Court of Appeals pursuant to section 6(f) of the Act, 29 U.S.C. § 655(f). *Louisiana Chemical Association v. Bingham,* 496 F.Supp. 1188 (W.D. La.1980). Upon appeal, the Fifth Circuit held that the basic function of a rule distinguishes a standard from a regulation, and that the records access rule "fits neatly within the language and history of section 8" because "it is among the more general class of enforcement and detection regulations contemplated by Congress in section 8." Accordingly, the Fifth Circuit reversed and remanded the matter to give this court the opportunity to consider the validity of the challenged rules. *Louisiana Chemical Association v. Bingham,* 657 F.2d 777 (5th Cir.1981).

Thereafter, both sides filed motions for summary judgment. Oral argument was heard on May 21, 1982 and the matter was taken under advisement. Having reviewed the extensive briefs, appendices, and other pleadings submitted by the parties and by amicus curiae, and considered the arguments presented by all parties and by amicus curiae at the hearing on May 21, 1982, the court finds that there is no genuine issue as to any material fact, and that the matter is appropriate for resolution on the cross motions for summary judgment.

## I. RULEMAKING AUTHORITY AND THE RECORDS ACCESS RULE

In determining the validity of the records access rule, the threshold question this court must address is, whether OSHA has the requisite statutory authority to promulgate such a rule. The principle is well settled however, that "[w]here the empowering provision of a statute states simply that the agency may 'make ... such rules and regulations as may be necessary to carry out the provisions of the Act,' ... the validity of the regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318, 329–330 (1973). Statutory language similar to that referred to by the Court in *Mourning* may be found as well in section 8(g)(2) of the Act, 29 U.S.C. § 657(g)(2), which reads as follows:

> (g)(2) The Secretary ... shall ... prescribe such rules and regulations as he may deem necessary to carry out (his) responsibilities under this chapter, including rules and regulations dealing with the inspection of an employer's establishment.

While the wording of this section is not identical to that cited in *Mourning,* the two sections serve as functional equivalents. Section (g)(2) imparts to the Secretary a broad grant of authority to discharge his responsibilities under the Act. Certainly, in so doing, the Secretary will be "carrying out the provisions of the Act."

In determining the validity of the records access rule in view of the guidelines set forth in *Mourning,* the purposes of the Act must also be considered. 29 U.S.C. § 651

states the purpose and policy of the Act, to-wit:

(b) The Congress declares it to be its purpose and policy ... to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources—

... (4) by building upon advances already made through employer and employee initiative for providing safe and healthful working conditions;

(5) by providing for research in the field of occupational safety and health, ... and by developing innovative methods, techniques, and approaches for dealing with occupational safety and health problems;

(6) by exploring ways to discover latent diseases, establishing causal connections between diseases and work in environmental conditions, and conducting other research relating to health problems, in recognition of the fact that occupational health standards present problems often different from those involved in occupational safety;

... (12) by providing for appropriate reporting procedures with respect to occupational safety and health which procedures will help achieve the objectives of this chapter and accurately describe the nature of the occupational safety and health problems;

(13) by encouraging joint labor-management efforts to reduce injuries and disease arising out of employment.

Even a cursory examination of the Act's overarching policy and the means by which it may be achieved make plain the fact that the records access rule bears at least a reasonable relation to that purpose. The rule will serve to establish a primary data base regarding long term exposure to toxic substances and harmful physical agents. Such a pool of information will obviously be of great utility to medical/industrial research in the isolation and identification of latent occupational diseases and health hazards ·yet unknown. Therefore, the records access rule aids in the research effort noted in 29 U.S.C. § 651(b)(5); provides an additional means of discovering latent diseases and establishing causal connections between diseases and work in environmental conditions within the meaning of (b)(6); establishes an additional reporting procedure as outlined in (b)(12); and serves to encourage labor-management efforts to reduce disease arising out of employment in accordance with (b)(13). Given the insidious nature and long term effects of many latent occupational diseases, a rule which establishes a data base for medical research, as does the records access rule, bears more than a mere reasonable relation to the major policy goal of the Act. The records access rule is quite directly related to the goals of assuring "safe and healthful working conditions" and "preserving our human resources."

While section 8(g)(2) would by itself provide sufficient authority for the records access rule, more specific support for the rule, with respect to OSHA access is found in § 8(c)(1), 29 U.S.C. § 657(c)(1):

(c)(1) Each employer shall make, keep and preserve, and make available to the Secretary ... such records regarding his activities relating to this chapter as the Secretary ... may prescribe by regulation as necessary or appropriate for the enforcement of this chapter or for developing information regarding the causes and prevention of occupational accidents and illnesses.

The plaintiff, LCA, construes this section to mean that OSHA may only have access to records which the Secretary compels employers to maintain. Where an employer voluntarily maintains medical and exposure records, LCA argues that the use of the conjunctive between "shall make" and "make available" precludes OSHA access. Such an interpretation of section 8(c)(1) would effectively preclude OSHA access under the records access rule, simply because that rule applies only to records voluntarily created.

To construe this section as not providing for OSHA access in circumstances in which critical information is already in existence, (records voluntarily created by employer) and the Secretary need not impose the obli-

gation on employers to actually make such records is illogical. LCA acknowledges that OSHA would have authorized access to the same records as are presently at issue under a rule conforming to their interpretation of § 8(c)(1). In order to make the records access rule conform with LCA's interpretation of § 8(c)(1), one would simply require exposure and medical records to be kept vis a vis numerous toxic substances and harmful physical agents. Such a regulation however might require the establishment of thousands of new exposure records. The records access rule on the other hand, imposes no record-making burden on employers whatsoever. The rule provides access only to records made at the employer's initiative, absent any regulatory prompting. In effect, LCA complains here because OSHA imposed less of a regulatory burden than it was authorized to.

█ Furthermore, by its very terms, § 8(c)(1) does not require the Secretary to find that records covered by rules promulgated thereunder must be important enough to compel employers to "make," as a prerequisite to a requirement that existing records be "ma[de] available."[1] The provision contemplates only that the Secretary will determine that the records in issue are "necessary or appropriate for the enforcement of the Act or for developing information regarding the causes and prevention of accidents and illnesses." This the Secretary has done, (See 45 F.Reg. 35226–35227), and therefore this court finds that OSHA access under the records access rule is authorized. With respect to access by employees and designated representatives, as noted previously, this court holds that § 8(g)(2) provides the necessary authority for OSHA's promulgation of the records access rule.

## II. IMPACT OF RULE ON OTHER LEGAL RIGHTS

Despite a finding that the records access rule is authorized, LCA contends that the rule is invalid because it impermissibly contravenes other legal rights. Specifically, these are the Fourth Amendment rights of employers, the privacy rights of employees, protections afforded employers under the Trade Secrets Act, 18 U.S.C. § 1905, and substantive areas allegedly reserved exclusively to the jurisdiction of the National Labor Relations Board (NLRB). This court finds that all of these contentions lack merit, and will address each in turn.

### 1. FOURTH AMENDMENT RIGHTS

In *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the Supreme Court held that government agents conducting contested searches under the Occupational Safety and Health Act required a warrant or subpoena pursuant to the Fourth Amendment. The *Barlow's* court also extended its analysis to encompass the inspection of documents and records. *Id.* at 324, n. 22, 98 S.Ct. at 1826, n. 22. LCA challenges the records access rule simply because the rule contains no express provision reiterating the *Barlow's* warrant requirement.

█ The omission of a warrant clause however, will not invalidate the rule. For if the agency's interpretation of the Act is sufficiently reasonable, then this court must uphold the rule. *Train v. Natural Resources Defense Counsel, Inc.,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975). The agency's interpretation of the Act is found not only in the rule itself, but in the rule's Preamble as well. There the Secretary acknowledges the *Barlow's* holding, and in particular n. 22, *supra,* of that opinion, applying the warrant requirement to records access. The Secretary states:

... [t]he separate constitutional right of employers to be free of unreasonable searches and seizures must also be taken

---

1. To do so would impose the strictures of § 6 "standards" upon the "more general class of enforcement and detection regulations" of § 8. It seems ironic that after appealing the original jurisdictional question to the Court of Appeals to delineate "standards" and "rules" that the plaintiffs would now urge this court to ignore the distinctions so clearly enunciated by the Fifth Circuit.

into account. *Marshall v. Barlow's, Inc.,* 436 U.S. 307 [98 S.Ct. 1816, 56 L.Ed.2d 305] (1978) . . .

Footnote 22 of that decision states (at p. 324 [98 S.Ct. at p. 1826] ):

Delineating the scope of a search with some care is particularly important where documents are involved.

. . . It is the Secretary's position, which we reject, that an inspection of documents of this scope may be effected without a warrant.

. . . [w]e recognize that the OSHA access requirement of this rule may not be self-enforcing . . . . the exact means OSHA will choose to gain access to records if an employer refuses to provide access voluntarily will depend on the particular circumstances of the case and future developments in the law.

45 F.Reg. at 35252.

LCA criticizes the Secretary's lack of specificity as to the "exact means" of OSHA access referred to in the Preamble. Under existing law, such means may take either the form of a warrant or subpoena.[2] Nowhere in the rule or the Preamble is there an indication that the Secretary has attempted to dispose of the warrant requirement as articulated in *Barlow's*. On the contrary, the Preamble to the rule gives every indication that OSHA fully intends to respect the Fourth Amendment rights of the plaintiff. On its face therefore, the rule, as read with the Preamble is a reasonable interpretation of the Act and therefore must be sustained vis a vis any Fourth Amendment claims of LCA.

## 2. PRIVACY RIGHTS

The focus of the privacy rights claim is, and must be, on access to personally identifiable medical records by OSHA, without employee consent.[3] By its terms, the rule grants private parties access to

employee medical records only upon express written consent by the affected employee. (29 C.F.R. § 1910.20(e)(2)(ii)(B). Such consent, of course, constitutes a waiver of the employee's right of privacy.

The issue of individuals' privacy interests in information gathered by government agencies is not new. The Supreme Court faced the issue squarely in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64. In *Whalen,* the validity of a state statute requiring the registration and recordation of all prescriptions for Schedule II drugs (e.g., opium, cocaine, methadone, amphetamine and methaqualone) was challenged. One basis of the attack was that the statute allegedly invaded a "constitutionally protected zone of privacy." *Id.* at 598, 97 S.Ct. at 875. The plaintiffs argued that the existence of such a data source "create(d) a genuine concern that the information (would) adversely affect their reputations." *Id.* at 600, 97 S.Ct. at 877.

The Court considered two possible bases for establishing a constitutional infirmity. First, was the prospect of unwarranted disclosures through improper administration of the statute's security provisions. Second, was the fact that "private information must be disclosed to authorized employees of the New York Department of Health." *Ibid.*

With respect to the first of these possible defects, Justice Stevens, writing for the Court stated that there was "no support in the record . . . for an assumption that the security provisions of the statute (would) be administered improperly." *Id.* at 601, 97 S.Ct. at 877. Therefore, the mere possibility of improper administration was not "a proper ground for attacking the statute on its face." *Ibid.* As to the second potential defect, it was held that such disclosures did not rise to constitutionally cognizable invasions of privacy.

**2.** Even the plaintiffs however acknowledge that as between the two, the choice is not clearcut.

We leave to one side the question whether OSHA may examine records by way of a warrant or whether the sensitivity of records examination requires not only the participation of a neutral magistrate, but an opportu-

nity for adversary contest in a subpoena proceeding of the agency's claim of need. Plaintiffs' Brief, at p. 18, n. 13.

**3.** As to non-identifiable information, no privacy interest attaches because such records cannot be definitely associated with any one particular employee.

Even without public disclosure, it is, of course, true that private information must be disclosed to the authorized employees of the New York Department of Health. . . . Nor are they meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care . . . . disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often as essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient.[29] Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy. *Id.* at 602, 97 S.Ct. at 878.

Footnote 29 of that decision states:

Familiar examples are statutory reporting requirements relating to venereal disease, child abuse, injuries caused by deadly weapons, and certifications of fetal death. . . .

Accordingly, the Court concluded that

We hold that neither the immediate nor the threatened impact of the patient-identification requirements in the New York State Controlled Substances Act of 1972 on either the reputation or the independence of patients for whom Schedule II drugs are medically indicated is sufficient to constitute an invasion of any right or liberty protected by the Fourteenth Amendment.

**4.** While there is union access under the medical access rule as well, the access can only be made upon employees' written consent. Therefore, the mere possibility of union access raises no privacy right issue in this case.

**5.** Under the rule, OSHA's access to personally identified employee medical records is carefully circumscribed in general, such access may be obtained only pursuant to a written access order, approved by the Assistant Secretary of Labor for Occupational Safety and Health upon the recommendation of the OSHA Medical Records Officer (who must be "an OSHA official with experience of training in the evaluation, ·use, and privacy protection of medical records"). (45 C.F.R. § 1913.10(c)(d)). Before approving an access order, the Assistant Secretary and Medical Records Officer must deter-

The *Whalen* case has been the source of many fruitful analogies throughout the government and amicus briefs. Not surprisingly, OSHA urges the court to follow the decision of the *Whalen* Court. LCA on the other hand, would have the court base its ruling on the contrasting decision of *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979). That case, however, involved the disclosure of records to the union as a remedial measure, rather than to the agency directly.[4] Additionally, there was ample evidence in that case to indicate that the information would be abused.

Indeed, the Company presented evidence that disclosure to individual scores had in the past resulted in the harassment of some lower scoring examinees who had, as a result, left the Company. *Id.* at 319, 99 S.Ct. at 1133.

In light of the factual distinctions between *Detroit Edison* and the case at bar, the court does not find the precedent of *Detroit Edison* persuasive. Rather, the more closely analogous factual background of the *Whalen* case indicates to this court that the law as defined therein should be the guiding precedent for this court to follow today.

■ Ample security measures for sensitive, *personally identifiable information* have been clearly outlined in the internal procedures rule.[5] The rule also carefully

mine that (1) the medical information "is relevant to a statutory purpose and there is a need to gain access to this personally identifiable information," (2) the personally identifiable information to be examined is "limited to only that information needed to accomplish the purpose for access," and (3) the personnel authorized to review the information are "limited to those who have a need for access and have appropriate professional qualifications." (*Id.,* § 1913.10(d)(2)).

Whenever medical information is taken off the employer's premises with direct personal identifiers included, the principal OSHA investigator must, unless otherwise authorized by the OSHA Medical Records Officer, separate and code the personal identifying information and medical information. Even in coded form,

circumscribes the use to be made of such data.[6] As in *Whalen,* no evidence exists in the record to indicate that the security provisions of the internal procedures rule will not be conscientiously enforced. The lack of such evidence, coupled with the stringent security measures for the safekeeping of sensitive, personally identifiable records, notes 4 and 5, *supra,* leads to the ineluctable conclusion that the privacy interests of LCA employees will be adequately protected under the standards of *Whalen* and the Fourteenth Amendment.

### 3. TRADE SECRETS ACT

LCA contends that the records access rule runs afoul of the Trade Secrets Act, 18 U.S.C. § 1905 because it requires the disclosure of "secrets" to private individuals or parties. The Trade Secrets Act reads in pertinent part:

> Whoever, being an officer or employee of the United States . . . makes known in any manner or to any extent *not authorized by law* any information coming to him in the course of his employment or official duties . . . which information concerns or relates to the trade secrets . . . of any person, firm, partnership, corporation, or association . . . shall be fined . . . or imprisoned . . . and shall be removed from office or employment. (emphasis added)

As all parties and amicus curiae readily agree, the critical case interpreting this statute is *Chrysler Corporation v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). The *Chrysler* Court held that the meaning of the phrase "authorized by law," when applied to regulations such as the records access rule, is whether the regulation has the "force and effect of law." *Id.* at 301, 99 S.Ct. at 1717.

In order for a regulation to have the "force and effect of law" it must, according to *Chrysler,* be imbued with three characteristics. First, the regulation must be a "substantive," rather than an "interpretive" rule.

> [I]n *Morton v. Ruiz* (citation omitted), we noted a characteristic inherent in the concept of a "substantive rule" as one "affecting individual rights and obligations." This characteristic is an important touchstone for distinguishing those rules that may be "binding" or have the 'force of law.' *Id.* at 302, 99 S.Ct. at 1717.

Second, the regulation must be issued pursuant to statutory authority. And third, "the promulgation of these regulations must conform with any procedural requirements imposed by Congress. . . . The pertinent procedural limitations in this case are those found in the Administrative Procedure Act." *Id.* at 303, 99 S.Ct. at 1718.

---

the medical information must "be used and kept secured as though still in a directly identifiable form." (*Id.,* § 1913.10(g). Agency files containing personally identifiable information must be "segregated from other agency files" and "kept secured in a locked cabinet or vault" when not in active use. (*Id.* § 1913.10(i)(1)). A log must be maintained of "uses and transfers of personally identifiable" information except as to "necessary uses by staff under" the "direct personal supervision" of the OSHA Medical Records Officer and principal OSHA investigator. (Id., § 1913.10(i)(2)). Personally identified information must be "destroyed or returned to the original recordholder when no longer needed for the purposes for which they were obtained." (*Id.,* § 1913.10(j)(1)).

**6.** Personally identifiable information "shall not be transferred to another agency or office outside of OSHA (other than to the Office of the Solicitor of Labor) or disclosed to the public . . . except when required by law or when ap-

proved by the Assistant Secretary." (*Id.,* § 1913.10(m)(1)). Subject to a limited exception, the Assistant Secretary must not approve an inter-agency transfer that has not been consented to by the affected employees unless the request is by a "public health agency" that "needs the information in a personally identifiable form for a substantial public health purpose," "will not use the requested information to make individual determinations" to the detriment of the affected employees, and "has regulations or established written procedures providing protection . . . substantially equivalent to" OSHA's regulations. (*Id.,* § 1913.10(m)(2)). And the Assistant Secretary is forbidden to "approve a request for public disclosure of employee medical information containing direct personal identifiers unless there are compelling circumstances affecting the health or safety of an individual." (*Id.,* § 1913.10(m)(4)).

**1144**

■ The records access rule clearly meets all three requirements set forth in *Chrysler.* The rule does effect individual rights and obligations, and is therefore a "substantive" rule. As LCA has indicated, the rule touches upon a great many personal rights such as those contained in the Fourth and Fourteenth Amendments, albeit, without violating them. Secondly, the rule was promulgated pursuant to the statutory authority found in sections 8(g)(2) and 8(c)(1), *supra.* And finally, as will be discussed in the final portion of this opinion, the promulgation of the records access rule was procedurally sound within the bounds of the Administrative Procedure Act (APA). Accordingly, the records access rule provides "authorization" to disclose trade secrets to non-government personnel under the Trade Secrets Act.

Section 15 of the Occupational Safety and Health Act, 29 U.S.C. § 664 incorporates the Trade Secrets Act by reference and provides the additional exception that "information may be disclosed to other officers or employees concerned with carrying out this chapter . . . ." LCA construes this language as limiting the access to confidential information only to government agents. Such a reading is unwarranted however. Section 15 does not place additional restrictions on the agency beyond those imposed by the Trade Secrets Act. Rather, it provides an additional exception for intragovernmental records access and indicates that confidential information is not to be indiscriminately or casually disclosed.[7]

### 4. NLRB JURISDICTION

■ The National Labor Relations Act (NLRB), 29 U.S.C. § 158(a)(5) requires that employers provide unions with information necessary to their proper performance as bargaining representatives, including information relating to matters of occupational safety and health. *N.L.R.B. v. Truitt Mfg. Co.,* 351 U.S. 149, 156, 76 S.Ct. 753, 757, 100 L.Ed. 1027 (1956). LCA contends that the subject of records access is therefore reserved to the exclusive jurisdiction of the NLRB, and that the rule promulgated by OSHA constitutes an impermissible invasion of that jurisdiction. Such an argument simply reaches too far. As the Secretary has observed:

. . . *any safety or health problem which OSHA could address would also be an appropriate subject for collective bargaining.* The failure to bargain in good faith on any health or safety problem would then be the subject of NLRB's adjudicatory and sanctioning powers. It may also be an appropriate matter for arbitration under a collective bargaining agreement. But when Congress added the Occupational Safety and Health Act to Federal labor policy, OSHA was given rulemaking authority intended not only to fill gaps in existing labor-management relations and the collective bargaining process, but to place a solid foundation under that process. Worker safety and health was thought by Congress to be too important to be resolved solely by the interplay of private economic forces and the rules established for economic warfare. OSHA, therefore, may appropriately set standards and provide remedies which are independent from, and in addition to, any rights afforded by the National Labor Relations Act. (emphasis added) 45 F.Reg. 35248.

As the underscored language plainly indicates, if LCA's argument was pressed to the extreme, all OSHA functions could be subsumed into the jurisdiction of the NLRB. At the same time, the reverse situation must not be permitted either. The objectives and jurisdictions of both agencies must be made to compliment and mutually accommodate one another. See *Southern Steamship Company v. N.L.R.B.,* 316 U.S. 31, 47, 62 S.Ct. 886, 894, 86 L.Ed. 1246 (1942); *Western Addition Community Organization v. N.L.R.B.,* 158 D.C.App. 138, 485 F.2d 917, 927–28 (1973); *Alleluia Cushion Co.,* 221 N.L.R.B. 999; *Memorandum of Understanding Between Department of Labor, Occupational Safety and Health Ad-*

**7.** Compare the internal procedures rule.

*ministration and National Labor Relations Board,* 40 F.R. 26083 (June, 1975).

LCA argues that OSHA has overstepped its jurisdiction, asserting that the agency's principal motivation for enacting the rule was to gain a benefit for employees and unions which they have been unsuccessful in securing through the NLRB. Specifically, the benefit of records access. The court must make little of such an allegation for two reasons. First, the records access rule is a duly authorized regulation, reasonably related to its underlying statute.[8] While the rule undoubtedly enhances the bargaining status of unions, it is plain on the record that this result was simply incidental to fulfilling the statutory goal of promoting healthful working conditions. Second, due to the requirement of the NLRA that employers provide the information to unions contemplated in this proceeding, and that fact that the Occupational Safety and Health Act was meant to supplement national labor policy, there is no indication that any impropriety has been committed by OSHA.

## III. OVERBREADTH

The final substantive challenge made by LCA is that the records access rule is impermissibly overbroad in its definition of "toxic substance." The definition is found at 29 C.F.R. § 1910.20(c)(11).

(11) "Toxic substance or harmful physical agent" means any chemical substance, biological agent (bacteria, virus, fungus, etc.), or physical stress (noise, heat, cold, vibration, repetitive motion, ionizing and non-ionizing radiation, hypo- or hyperbaric pressure, etc.) which:

(i) Is regulated by any Federal law or rule due to a hazard to health,

(ii) Is listed in the latest printed edition of the National Institute for Occupational Safety and Health (NIOSH) Registry of Toxic Effects of Chemical Substances (RTECS) (See Appendix B),

(iii) Has yielded positive evidence of an acute or chronic health hazard in human, animal, or other biological testing conducted by, or known to, the employer, or

(iv) Has a material safety data sheet available to the employer indicating that the material may pose a hazard to human health.

Specifically, LCA's complaint is over the inclusion of (11)(ii)—the National Institute for Occupational Safety and Health Registry of Toxic Effects and Chemical Substances. By including all substances listed in the Registry in the definition of toxic substance, LCA argues that "OSHA has eschewed any distinctions based upon the nature of the risk, the degree of risk, the extent of the knowledge about the substance, ... or any other basis that might differentiate greater from lessor (or non-existent) public interest in retention and access of records relating to the substance." Plaintiff's Brief at 60.

The Registry is a compilation of substances which have produced positive results in toxicity tests. Its editors make no attempt however to interpret contradictory data or test results, and even include toxic effects produced in laboratory animals by means unlikely to occur in the workplace. Also, the Registry includes certain substances found in household use on a daily basis such as table salt, sugar, lemon oil, vitamins B and C, and baking soda. For each of the above enumerated substances not considered by the layman to be dangerous however, are thousands of other chemicals and industrial compounds, the toxic effects of which are immediate and severe. There are additionally, tens of thousands of chemicals listed in the Registry, the long term toxic effects of which are simply unknown. In short, the Registry is a listing of those chemicals research scientists will be keeping an especially close eye on in attempting to identify the sources of occupational diseases. These are the chemicals presently considered to pose the greatest potential threat as causal factors of occupational disease and illness.

---

**8.** One of the major goals of the Act noted earlier was to provide "healthful working conditions ... by encouraging joint labor-management efforts to reduce injuries and disease arising out of employment." 29 U.S.C. § 651(b)(13).

LCA would prefer that each substance potentially subject to the records access rule be tested for hazardous properties before final inclusion in the rule. In fact, LCA argues that if such a procedure is not followed, the rule must be considered overbroad. Plaintiff's complaint here is unfounded, and the thrust of the argument is unresponsive to the very concept of a generic records access rule. The core purpose of the rule is to gain greater knowledge of substances whose effects and characteristics are not yet fully understood. The rule will make the data available to researchers to determine exactly which of the substances listed in the Registry pose serious threat to life and limb and thus will merit more direct regulation via section 6 standards at some future date.

The fact that some ostensibly harmless compounds such as lemon oil are included in the Registry will not sustain plaintiff's claim of overbreadth. In "defining a class subject to regulation, '[t]he inclusion of a reasonable margin to insure effective enforcement, will not put upon a [rule] otherwise valid, the stamp of invalidity.'" *Mourning v. Family Publications Service, Inc.,* 441 U.S., at 374, 93 S.Ct., at 1663. If agencies "issue and interpret regulations which are rational and supportable in their general application, they cannot necessarily be charged with unreasonableness because in particular applications the regulations and general interpretations may grind with a rough edge." *Gulf Oil Corp. v. Hickel,* 140 D.C.App. 368, 435 F.2d 440, 447 (1970).

■ In this court's opinion, the records access rule, while including a "reasonable margin to insure effective enforcement" in its definition of "toxic substance," can hardly be said to "grind with a rough edge." Strikingly absent from the plaintiff's brief has been any recognition of the critical ingredient of the records access rule—that it applies only to records created voluntarily by employers. Therefore, if lemon oil happens to be used by LCA members, that fact in itself does not compel them to keep medical and exposure records regarding employee contact with that delightfully fragrant

substance. Employers can pick and choose from among the chemicals their employees come in contact with as to which chemicals shall be documented and which shall not.

There is a fundamental distinction between the records access rule and the rules held invalid in cases cited by LCA. See *National Nutritional Goods Ass'n. v. Mathews,* 557 F.2d 325 (2d Cir.1977). As has been articulated by legal scholars, "disclosure" regulations are far less intrusive and restrictive than "command and control" regulations. The former, as the name implies, requires only a disclosure of information regarding a product, while the latter actually restricts or compels the conduct of manufacturers. Because the records access rule neither restricts nor compels recordmaking, but rather allows access to records made only at employers' behest, the rule is more akin to a "disclosure" rule. "Thus, when regulators seek disclosure, they need not fine-tune standards quite so precisely. They themselves need less information from industry, there are fewer enforcement problems, there is less risk of anticompetitive harm, and there is greater probability of surviving judicial review." Breyer, 92 *Harvard Law Review* 549, 580 (Jan. 1979), "Analyzing Regulatory Failure: Mismatches, Less Restrictive Alternatives, and Reform."

The regulatory scheme at issue in this case is a two step program designed to identify and then regulate patently dangerous substances in the least intrusive method possible. First, the section 8 "rule" (records access rule) is used to define a subset of potentially dangerous substances to be subject to research. If that research indicates that a particular substance is truly harmful, then the more restrictive section 6 "standard" will be imposed on that substance.

The "8 to 6" regulatory scheme outlined above is imminently reasonable and clearly serves to promote the goals of the Act. Considering the disclosure-type regulation found in the records access rule, it poses no burden on the plaintiffs except to maintain records they choose to compile. In light of these findings, and the jurisprudence previously cited, this court finds that the records

access rule is not impermissibly overbroad, and that it withstands all substantive challenges asserted by plaintiffs.

## IV. NOTICE AND COMMENT PROCEDURE

█ In addition to the substantive issues previously addressed, LCA has also raised the procedural claim that the records access rule was not promulgated in compliance with the Administrative Procedure Act (APA). 5 U.S.C. § 553. In particular, LCA alleges that the definition of "toxic substance and harmful physical agent" set forth in the final version of the rule [9] is such a radical expansion from the meaning of that term as used in the proposed rule, that they received no "notice" of, and were effectively denied the opportunity to "comment" on that portion of the rule.

Judge Skelly Wright has succinctly summarized the jurisprudence and legal principles which govern this question as follows:

The Occupational Safety and Health Act itself simply requires the Secretary to publish a proposed rule in the Federal Register, 29 U.S.C. § 655(b)(2) (1976), but implicitly incorporates the general requirement for informal rulemaking in 5 U.S.C. § 553(b)(3) (1976): notice of "the terms or substance of the proposed rule or a description of the subjects and issues involved." The agency must "fairly apprise interested persons" of the nature of the rulemaking, *American Iron & Steel Institute v. EPA*, 568 F.2d 284, 293 (3d Cir.1977), but a final rule may properly differ from a proposed rule—and indeed must so differ—when the record evidence warrants the change. "A contrary rule would lead to the absurdity that in rulemaking under the APA the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." *International Harvester v. Ruckelshaus* [155 D.C. App. 411], 478 F.2d 615, 632 n. 51 (D.C. Cir.1973). Where the change between proposed and final rule is important, the question for the court is whether the

final rule is a "logical outgrowth" of the rulemaking proceeding. *South Terminal Corp. v. EPA*, 504 F.2d 646, 659 (1st Cir. 1974). The courts have described the notice requirement with other verbal formulas, but general principles only take us so far. We must proceed to compare carefully the specific language of the proposal with that of the final rule, in light of the evidence adduced at the hearings.

*United Steelworkers of America, Etc. v. Marshall,* 208 U.S.App.D.C. 60, 647 F.2d 1189, 1221 (1980). In *South Terminal, supra,* a rule was proposed by the Environmental Protection Agency (EPA) to improve the primary and secondary ambient air quality in Boston, Massachusetts. In his notice of the rulemaking the Administrator stated that to improve air quality, the proposed plan would "discourage continued heavy reliance on the automobile." *Id.* at 656. In order to accomplish this goal, the proposed rule included *inter alia,* "a ban on on-street parking in the Boston core area from 6 to 10 A.M. and 4 to 6 P.M., weekdays." *Ibid.* As a result of the comment procedure however, when the final rule was promulgated, there appeared instead a total freeze on parking in certain designated areas. The final rule drastically reduced South Terminal Corp.'s parking business. They brought suit alleging that the total freeze on parking in certain areas was not a foreseeable result of the proposed rule and therefore violated the notice requirements of the APA.

In response to the argument, the First Circuit stated that:

A hearing is intended to educate an agency to approaches different from its own; in shaping the final rule it may and should draw on the comments tendered. The plan seems a logical outgrowth of the hearing and related procedures.... "The requirement of submission of a proposed rule for comments does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule

---

**9.** *Supra,* at 1145.

it proposed, partly at least in response to submissions." *International Harvester Co. v. Ruckelshaus,* [155 D.C.App. 411] 478 F.2d 615, 632 (D.C.Cir.1973).

*Id.* at 659.

In the instant case, the record provides ample support for OSHA's contention that the addition of a definition of "toxic substance and harmful physical agent" in the final rule is a "logical outgrowth" of the comment proceedings. That is, there was adequate notice that the topic would be addressed, and that the shape of the final rule was in some way attributable to the input of interested parties. As the following excerpt indicates, there was in fact adequate notice in the Preamble of the proposed rule that OSHA intended the coverage of the rule to be given broad scope:

> This proposed rule on access to employee exposure records and employee medical records would implement OSHA's policy under the Occupational Safety and Health Act of 1970 that employees have the basic right to know about their exposures to workplace hazards and the effects of exposure.

> \* \* \* \* \* \*

> The goals of occupational safety and health are not adequately served if employers do not fully share the available information on toxic materials and harmful physical agents with employees.

> \* \* \* \* \* \*

The Assistant Secretary has previously stated OSHA's policy concerning employees' rights to this type of information: The Act's declared objectives and specific implementing provisions demonstrate the importance of providing employees with full and complete information about safety and health conditions at the worksite.

\* \* \* \* \* \*

> If a record contains information which is useful to determine employee exposure, the record would be covered by this rule even though the record was not created for occupational health purposes.

43 F.Reg. 31371, 31373.

The underscored language indicates both that the agency would apply the rule to the broadest possible range of medical and exposure records, and also makes it clear that the rule would certainly be applied to more substances than just those subject to other occupational health regulations, such as section 6 standards.

Not only was there notice of the broad scope of the rule, but there was much discussion of the matter during rulemaking and comment proceeding. 45 F.Reg. 35257–35267. Most of the discussion was aimed at narrowing the scope of the rule. In conformity with these comments, "OSHA felt it was important to limit the rule to those chemicals, biological agents, and physical stresses for which there is some evidence of toxicity or harmfulness." *Id.* Accordingly, OSHA then set forth the definition of "toxic substance or harmful physical agent." While this may not be a model of administrative procedure,[10] it does satisfy the "logical outgrowth" test.

Again, it is also the nature of the rule which in part impels this court to approve the notice and comment procedure. It bears repeating that the rule imposes no recordmaking burden whatsoever on employers. While this certainly does not relieve OSHA of its duty to comply with the strictures of the APA, it does render the impact of notice and comment procedures less severe. It is difficult to say how parties could be prejudiced by a rule which does not require them to make any records other than those they compile at their own initiative.

---

10. This court cannot congratulate OSHA for fulfilling the spirit of the APA. Why a term such as "toxic substance and harmful physical agent" which is used with such frequency throughout the rule was not defined in the proposed rule is an enigma. "Our task, however, is only to see whether the agency has complied with the law, and though the notice of rulemaking could well have been clearer and more specific, it meets the demands of that ubiquitous term of art in administrative law—'adequacy.'" *United Steelworkers, supra,* at 1221.

## V. ORDER

The records access rule, 29 CFR § 1910.20 and the internal procedures rule, 29 CFR § 1913.10 are free of any substantive or procedural error as alleged by the plaintiff, LCA. Accordingly, the court hereby denies plaintiff LCA's Motion for Summary Judgment and grants defendant OSHA's Motion for Summary Judgment.

SO ORDERED.