175 Ill. App.3d 191 (1988)
529 N.E.2d 773
AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 31, AFL-CIO, Petitioner,
v.
ILLINOIS STATE LABOR RELATIONS BOARD et al., Respondents.
No. 87-3309.
Illinois Appellate Court  First District (4th Division).
Opinion filed September 22, 1988.
*192 *193 Cornfield and Feldman, of Chicago (Gilbert Feldman, of counsel), for petitioner.
Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Valerie J. Peiler, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois State Labor Relations Board.
Nick A. Cetwinski, of La Grange, for respondents City of Clinton and Dr. John Warner Hospital.
Judgment affirmed.
JUSTICE LINN delivered the opinion of the court:
Petitioner, American Federation of State, County, and Municipal Employees, Council 31, AFL-CIO (AFSCME), brought this action against respondents, Illinois State Labor Relations Board (Board), City of Clinton, and Dr. John Warner Hospital, seeking reinstatement of two employees of the hospital who were discharged. AFSCME charged respondents Clinton and the hospital with unfair labor practices under section 10 of the Illinois Public Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, pars. 1610(a)(1), (a)(2)), alleging that they discharged Tara Lawson and Ronald West in retaliation for their union activities. The hearing officer of the Board held in favor of petitioner. The Board, however, reversed the hearing officer's decision and dismissed the complaints.
On appeal to this court, AFSCME contends that the Board's decision was premised on an improper test or standard of "union animus" and that the decision of the Board is against the manifest weight of the evidence.
We affirm.

BACKGROUND
Tara Lawson and Ronald West were employed by Dr. John Warner Hospital as emergency medical technicians (EMTs). The hospital, located in Clinton, Illinois, provides DeWitt County with ambulance services. The primary function of EMTs is to immediately respond to emergency medical calls, which puts them first at the scene of the emergency. There they evaluate the nature and extent of the victim's illness or injury and administer specified diagnostic and emergency treatment procedures. They then transport the victims to the hospital.
The EMTs work in teams of two, one driver and one attendant. Each team on duty is classified as a "team 1" or "team 2." Team 1 members are required to be present in the hospital, while the team 2s are backups, who are required to be within five minutes of the hospital. *194 The teams are on 24-hour shifts that run from 7 a.m. of one day to 7 a.m. of the following day.
Time is of the essence for EMTs; they must respond immediately to a call because there is no way to gauge the extent of the emergency and delays could literally mean the difference between life and death.
Because the shifts last 24 hours, team 1 members are allowed to sleep during their shift. Male members of team 1 are assigned a room next to the ambulance garage. This room has two beds, a shower, and a speaker for the public address system. Female team members are assigned whatever patient room is vacant. There is no speaker in any of the patient rooms, but speakers are in the hallways.
After 9 p.m., team 1 members are presumed to be in their rooms. If they plan to go to their room to sleep before 9 p.m., the team member is to advise the dispatcher of that fact. This is an unwritten policy.
Each team member is issued a portable two-way radio to communicate with the dispatcher. EMTs on duty are required to wear the radios and leave them on. When the hospital dispatcher receives a call, she records the time of the call and transmits the call to the team 1 members. During daytime hours, the dispatcher announces "Code Orange, Code Orange" over the public address system. The dispatcher also announces the call over the portable radio system. During the radio communication, the dispatcher advises the EMT of the nature of the call, classifying it as code 1, 2, or 3, depending on the severity of the illness or injury.
If the call comes in after 9 p.m. the dispatcher does not use the public address system, in order to avoid disturbing the hospital's patients, but instead telephones the EMTs in their rooms and communicates over the two-way radios.
Each employee of the hospital receives an employee handbook. This contains a condensed version of the personnel policy and procedures manual which is located in the ambulance garage. The handbook lists the types of employee discipline and the conduct which warrants discipline. Among the types of conduct warranting immediate termination of employee is "neglect or inconsiderate treatment of a patient." Both Lawson and West were charged with this conduct.

THE DISMISSAL OF TARA LAWSON
Lawson had been employed as a part-time EMT for approximately six months before she was dismissed.
On June 27, 1986, Lawson was on team 2. From midnight until approximately 4 a.m., she was called to the hospital three times to cover calls while team 1 was on assignment. At 7 a.m. on June 28, *195 1986, Lawson reported for duty as a member of team 1, with her partner Michael Guile.
Lawson told the hospital dispatcher that her assigned room for the night was Room 214. At 6:30 p.m., she went to her room to watch television. She mentioned this in passing to the dispatcher, who testified at the hearing that she did not hear Lawson.
At 7:29 p.m., the dispatcher received a "Code 3" call from a possible stroke victim. Code 3 means a life-threatening situation. The dispatcher announced "Code Orange" over the public address system twice and also announced it twice over the two-way radio. Lawson, however, was asleep and did not hear the announcements. She may have lain atop her radio, which was attached to her left hip. The television set was on. Lawson had turned down the volume on her radio.
Guile, Lawson's partner, was in the ambulance with the motor running, waiting for her when the dispatcher called to see if they had left. He replied in the negative, stating that he had no attendant. The dispatcher then telephoned Lawson's room. The telephone rang six times before Lawson answered. Four minutes had elapsed by that time. Meanwhile, a team 2 member had arrived and he accompanied Guile to the call. It took them only one minute to reach the stroke victim, for a total of five minutes response time.
Hospital personnel interviewed Guile, Lawson, and the dispatcher. Two days after the incident the hospital discharged Lawson for "neglect or inconsiderate treatment of a patient."

THE DISMISSAL OF RONALD WEST
Ronald West began working as an EMT in June 1977. He and Pamela Watkins began their shift as team 1 at 7 a.m. on November 26, 1986. Twenty-four hours later, at 6:53 a.m. June 27, a call came in regarding a cardiac patient who needed oxygen and was to be transported to another hospital. June Hall, the dispatcher, telephoned the ambulance room at 6:55 and West answered. Hall gave him the information and West told her that the team who was scheduled to begin its shift at 7 a.m. would answer the call.
Hall then telephoned the cafeteria, where the EMTs often gathered at shift changes. Simultaneously, she paged Jim Martin, the driver of the oncoming team, over the public address system. Hall telephoned West back, telling him that the oncoming team had not yet reported in at the hospital. West told Hall that he would find them.
Pam Watkins, West's partner, called Hall and asked if she and West had a call. Hall told Watkins that West knew all about the call. West called Watkins in the ambulance garage and told her not to leave *196 the hospital because she would have to cover for the team 1 attendant, who had not yet arrived at the hospital. Mark Upton, the tardy member of the oncoming team, had overslept and alerted the hospital that the outgoing team would have to take the call.
Watkins prepared to leave the hospital with Martin, at approximately 7:14 a.m., 21 minutes after the call had come in but West decided to take the call with Watkins, his partner, so as not to break up the teams. West later incorrectly logged in the time of the call as 7:05 rather than 6:53.
The hospital's personnel director, Belinda Rittenhouse, conducted extensive interviews of all personnel involved. Based on the results of the investigation, West was discharged from the hospital. Mark Upton was not discharged for oversleeping while on back-up duty.
Tara Lawson and Ronald West were both active members of AFSCME, who filed a petition on their behalf seeking injunctive relief against the hospital, the reinstatement of Lawson and West, and back pay. After the hearing, the hearing officer reduced his findings and conclusions to a written recommendation to the Board. He found that AFSCME had proved its claim that the two employees had been discharged for union activity and recommended their reinstatement and other relief. On review, however, the Board reversed the hearing officer and dismissed the petition.

OPINION

I
 1 Our review of the Board's decision is taken pursuant to section 3-110 of the Administrative Review Law (Ill. Rev. Stat. 1985, ch. 110, par. 3-110), which provides in part that the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." It is not the duty of this court to weigh evidence, but rather to ascertain if the findings and decision of the agency are against the manifest weight of the evidence. Rockford Township Highway Department v. Illinois State Labor Relations Board (1987), 153 Ill. App.3d 863, 872, 506 N.E.2d 390, 395.
AFSCME contends that the sole question is whether the record establishes that the termination of Lawson and West was based upon a pretext, the real reason being union animus, an unfair labor practice.
 2 Section 10 of the Illinois Public Labor Relations Act provides in part:
"(a) It shall be an unfair labor practice for an employer or its agents:

*197 (1) to interfere with, restrain or coerce public employees in the exercise of the rights guaranteed in this Act or to dominate or interfere with the formation, existence or administration of any labor organization * * *
(2) to discriminate in regard to hire or tenure of employment or any term or condition of employment in order to encourage or discourage membership in or other support for any labor organization." Ill. Rev. Stat. 1985, ch. 48, pars. 1610(a)(1), (a)(2).
Because section 10(a) of the Illinois Act parallels the Federal counterpart (National Labor Relations Act, 29 U.S.C. § 158 (a) (1982)), the Illinois courts may look to Federal decisions in interpreting this portion of the Illinois Act. Rockford Township Highway Department v. Illinois State Labor Relations Board (1987), 153 Ill. App.3d 863, 878, 506 N.E.2d 390, 397.
 3 It is an unfair labor practice for an employer to discharge a worker because of union activity. (NLRB v. Transportation Management Corp. (1983), 462 U.S. 393, 76 L.Ed.2d 667, 103 S.Ct. 2469.) The elements necessary to prove an unlawful discharge are: "(1) union or protected concerted activity, (2) employer knowledge of such activity, (3) animus toward such activity, and (4) an adverse employment action under suspect circumstances. (Cites omitted.)" (County of Peoria, 3 Pub. Employee Rep. (Ill.) par. 2028, case No. S-CA-336, at VIII  194 (Illinois State Labor Relations Board, March 23, 1987).) In the pending case, the Board accepted the hearing officer's findings that AFSCME established the first, second, and fourth elements, but disagreed that the evidence established union animus.
 4 Union animus may be inferred from such circumstantial evidence as the timing of the discharge (as where the discharge takes place within a few days of significant union activity); disparate treatment among employees; and a showing that the employer's asserted justification for the discharge is a mere pretext. See Birch Run Welding & Fabricating, Inc. v. NLRB (6th Cir.1985), 761 F.2d 1175, 1179; NLRB v. Del Ray Tortilleria, Inc. (7th Cir.1986), 787 F.2d 1118.
AFSCME charges that the Board added an unwarranted gloss to the concept of disparate treatment, thereby changing the applicable test. According to the hearing officer and cases he relied on, the disparate treatment test is satisfied "when discharged employees are treated differently than others who had committed similar offenses." As paraphrased by the Board, the charging party must establish that "the employees who allegedly committed similar offenses and were not similarly disciplined were not union supporters." (Emphasis added.) According to AFSCME, the Board improperly put a burden of proof *198 on it to establish the union affiliation of those who were not discharged for similar offenses.
We do not agree that the Board intentionally changed or added to the existing law on what constitutes proof of disparate treatment. Disparate treatment is only one factor in the union animus analysis; assuming that there is no evidence of union affiliation among the persons who committed similar offenses but were not discharged, the charging party would still be required to establish the link between the unequal treatment and the employer's anti-union motives. (Cf. NLRB v. Transportation Management Corp. (1983), 462 U.S. 393, 76 L.Ed.2d 667, 103 S.Ct. 2469 (if petitioner proves that union animus partly motivated layoffs, employer must show by preponderance of evidence that employees would have been laid off even if they had not engaged in protected activity).) True, the timing of the discharge and the employer's knowledge of the discharged employee's union activities are relevant. However, the Board in the instant case rejected the hearing officer's conclusion that the hospital had treated West and Lawson differently from other employees who had committed "similar" offenses between 1980 and 1985, largely because of a failure of proof.
 5 We have attempted to cull from the lengthy record references to the discipline of other employees. Several witnesses related what they had been told by others, hearsay testimony of questionable accuracy. At one point, evidence relating to the discipline of other employees was supposedly admitted only to show Lawson's knowledge or mental state regarding the possible consequences of her tardy response to the emergency call. As such, it is of limited probative value on the question of whether the employer's differing treatment of employees was attributable to union animus. Moreover, the testimony offered regarding the discipline of other employees was vague and uncertain, conflicting from one witness to the next. For example, Lawson testified that she had been told that John Allen had missed a call while on team 1 because he was taking a shower, while Michael Guile's testimony was that Allen failed to respond to a call because he had no radio or pager. Allen was not disciplined. Guile recollected that Rick Hunt once slept through a page, while Pat Danison stated that Hunt's pager was not working due to a mechanical failure. Hunt was not disciplined. In another incident neither Pam Watkins, an active union supporter, nor Michael Guiles, the EMTs' "trainer," was disciplined for using an ambulance for personal business, a violation carrying the possibility of termination of employment. On the other hand, Roy Davenport was discharged for failing to timely respond to calls twice in three days. None of the above situations mirrors the case of either Lawson or West.
*199 Another factor diluting the probative impact of evidence of other employee discipline is that the severity of the offense appears to be largely related to whether the employee was on duty as team 1 or backup as team 2. The hospital's classification system provides that team 1 members are first in line to answer ambulance calls, so that a team 1 EMT who misses a call without justification is in a different position than one who is on backup or who is late at the beginning of his shift.
A further complication in the pending case is that the union did not come into existence until 1986. The hospital's disciplinary procedures before that time, therefore, were not causally related to union activities. The hearing officer found that the hospital treated West and Lawson differently from other employees who had allegedly committed offenses between 1980 and 1985, but failed to specify which incidents he relied on and how they were similar. Although AFSCME argues that there was a pre-union policy of leniency that changed without warning, we do not find this persuasive on the union animus question.
Although the disparate treatment evidence was not well developed, it does appear that the hospital lacked uniformity in some of its disciplinary decisions over the years. For example, James Cobb, who failed to timely respond to a call while he was having a back massage, was only given a verbal warning, although the hospital administrator noted that Cobb should have been discharged. Cobb, apparently, was a team 2 member at the time. Jim Martin, while on team 2, missed an in-house emergency call but was not disciplined. The switchboard operator rang the room he was staying in 11 or 12 times. However, the circumstances surrounding this incident were not clear; the operator may have telephoned the wrong room and in the meantime the emergency ended.
The hearing officer apparently found persuasive the fact that Jim Martin, in the above incident, was not disciplined while Lawson and West were. The hearing officer also relied on the fact that Mark Upton, who was late reporting for his shift because he overslept was not disciplined in the same incident in which West was discharged. The hearing officer contrasted Lawson's discharge with the lack of discipline against Upton and Martin and noted that there was "no evidence in the record to support a finding that either Martin or Upton are AFSCME members or supporters." The Board, however, rejected the assumption that because no evidence of union support was introduced, they were not union supporters.
Upton was on the incoming team at the time of the incident and, since he was not yet on duty when the call came in, he was not in the *200 same position as either Lawson or West. As the Board found, the fact that Upton overslept before starting his shift as team 1, plus the fact that it was his first offense, may well be responsible for the different treatment he received. Moreover, it was West, not Upton, who refused or at least deliberately delayed taking the call. West's conduct was more serious an offense under the circumstances.
As for Martin, the facts were not clear as to what exactly happened when he missed the in-house emergency call. Since other hospital personnel would have been available, moreover (since the EMT teams at the hospital fill in as assistants when not on a call), the hospital may view missing or delaying an outside call more critical than an inside call, because the ambulance team is the first and only team available for the outside emergency.
As noted, the record does not indicate Upton's and Martin's status as pro-union or neutral. Accordingly, we do not draw an inference one way or the other. The hearing officer assumed they were not union supporters and further assumed that is why they were not disciplined; the Board simply negated that assumption by pointing out there was no evidence adduced on the issue. Presumably, either side could have introduced such evidence if either felt it important on the issue of union animus or lack thereof. Accordingly, we do not find the bare indication that some employees were disciplined under some circumstances and others were not (under different circumstances) rises to a presumption of disparate treatment due to union animus. We conclude that, to the extent disparate treatment was shown of record, AFSCME failed to establish that it was related to union activities.
 6 The Board further found, and we agree, that the timing of Lawson's discharge was of limited significance in this case. While we accept AFSCME's assertion that the hospital may have had actual or presumed knowledge of Lawson's election day activities, we find that the timing of Lawson's termination, several days after the certification of the union, is not controlling on the union animus determination. It is but one factor to be weighed with the others. Standing alone, or even together with the hazy disparate treatment evidence presented, it is insufficient to establish union animus.
 7 The remaining element of the analysis is whether the evidence sustains the hearing officer's finding that the discharge of Lawson and West was pretextual. Both the hearing officer and the Board considered the evidence of disparate treatment as the cornerstone for the pretextual element of union animus. Therefore, the same deficiencies in the evidence as noted in the preceding section apply here. Analytically, pretext means that the discharge was a sham, the true reason *201 being retaliation for union activity. If termination is for legitimate cause, it cannot truly be pretextual.
In the pending case, two EMTs unquestionably failed to respond quickly to ambulance calls while on duty as team 1 EMTs. There is evidence that a four-minute delay in response time can mean brain death to a stroke victim. The public health and safety should not be submerged in a narrow discussion of the private employment rights of two people. We recognize that employers can penalize union supporters by unfair practices that may be difficult to prove. We do not believe, however, that the record in this case supports the hearing officer's determination that the discharge of Lawson and West was pretextual. Certain evidence of alleged pretext, which AFSCME contends that the Board ignored, is unpersuasive. For example, AFSCME contends that the Board overlooked the hospital's failure to warn EMTs before Lawson's discharge that a failure to respond or delayed response to a call would result in discharge. We believe, however, that EMTs should be aware without being reminded that the nature of their job entails a high level of responsibility. Even if some employees were not discharged in the past for delays in response time, the hospital should not be precluded from terminating an employee on that basis. While the hospital's policies could be more explicit, it may not be feasible to foresee each situation in which employees' acts or omissions will be subject to discipline.
Lawson was literally asleep on the job. While sleeping (and showering) is permitted, even for team 1 members on duty, it is incumbent upon the employee to follow the safeguards, written or not, that ensure that he or she will awaken as soon as a call is broadcast over the radio, public address system, or telephone. The facts are undisputed that Lawson's casual mention to the switchboard operator that she was going to her room at 6 p.m. did not register on the operator. Lawson turned down her radio and turned on the television. She fell asleep, possibly on top of her radio attached to her hip, and slept through the six rings of the telephone. That she may have been tired from her previous shift as a team 2 member is not an excuse. The nature of the job dictates that she be ready and able to respond with immediacy to an emergency call. The delay attributable to her actions on the night in question was four minutes, enough to make a decided difference to the health of the stroke victim waiting for the ambulance.
West's conduct was deliberate, in the sense that he made a decision on his own that turned out to be improper (and potentially disastrous for any person in need of immediate medical treatment). He decided that since the call came in a few minutes before the end of his shift, *202 the incoming team would handle it. While this may have been an acceptable practice if both teams agreed and no delay resulted, in this particular situation, West was told that the incoming team was not then available. He should have taken the call without searching around for the new team, an act that ultimately delayed the response to the call by approximately 20 minutes. While he could not have foreseen that Upton would oversleep on that day, his own shift did not end until 7 a.m. and he definitely was the driver responsible for the 6:53 call. His partner responded to the call and went to the garage. He told her to wait and accompany the oncoming team driver. Then he changed his mind and went with her, leaving the hospital many minutes later than he would have if he had promptly responded to the call. He gambled with the health of the patient awaiting the ambulance.
The hospital's policies were not revealed to be a model of uniformity and precision. Nevertheless, we believe that the basic procedures and practices are sufficient to put all employees on notice that they are charged with the quickest response times possible. Any situation of their own making that delays their response time endangers the victims of traumatic injury or illness. The hospital must retain flexibility to assess each case on its own merits, as it did here. The investigative procedures in the pending case appear to be adequate. In any event, we are not called upon to review the decision-making process of the hospital, except insofar as the evidence shows that the terminations in question were a pretext and that the employer's animus toward the union was responsible for the disparate treatment alleged here.
We conclude from reviewing the record that the Board's reversal of the hearing officer's recommendation and dismissal of the petition was proper and in conformity to the evidence adduced. Accordingly, we affirm the decision of the Board.
Affirmed.
JIGANTI, P.J., and JOHNSON, J., concur.