WATER PIPE EXTENSION, Bureau of Engineering, Laborers Local 1092, *et al.*, Petitioners, v. THE CITY OF CHICAGO *et al.*, Respondents.

First District (6th Division) No. 1—88—2830

Opinion filed January 26, 1990.—Modified on denial of rehearing March 30, 1990.

Joseph T. Moriarty, of Erbacci, Syracuse & Cerone, Ltd., of Chicago, for petitioners.

Neil F. Hartigan, Attorney General, of Springfield (Valerie J. Peiler, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Local Labor Relations Board.

Judson H. Miner, Corporation Counsel, of Chicago (Kelly R. Welsh, Ruth M. Moscovitch, and Frederick S. Rhine, Assistant Corporation Counsel, of counsel), for respondent City of Chicago.

JUSTICE EGAN delivered the opinion of the court:

The petitioners, Water Pipe Extension, Bureau of Engineering, Laborers Local 1092 (Local 1092) and County Municipal Employees', Supervisors' and Foremen's Local 1001 (Local 1001) (collectively, unions), filed an unfair labor practice complaint against the respondent City of Chicago (City) with the respondent Illinois Local Labor Relations Board (Board or ILLRB). The unions asserted that the City had violated sections of the Illinois Public Labor Relations Act (Ill. Rev.

Stat. 1987, ch. 48, pars. 1610(a)(1), (a)(4)) by refusing to give the unions information that the unions alleged was necessary for the administration of the parties' bargaining agreement.

The hearing officer determined that the City had not committed an unfair labor practice in refusing the unions' demands because the unions failed to establish their right to routine access to the information. The hearing officer also concluded that the unions had waived any right to the information in a so-called "zipper clause" in the bargaining agreement. The Board adopted the hearing officer's findings and conclusions and dismissed the complaint.

Before discussing the propriety of the Board's dismissal, we must first address the City's motion to dismiss the unions' petition for review on the ground that this court lacks jurisdiction because the petition was allegedly filed too late.

On August 25, 1988, the ILLRB entered its order dismissing the petitioners' complaint. On the same date, copies of the order, which were addressed to the parties' attorneys, were deposited in the United States mail, postage prepaid for certified mail, return receipt requested. The attorney for the petitioners asserts that he received the order on August 31, 1988.

On September 27, 1988, 33 days after the order was entered and 27 days after the petitioners' attorney received the order in the mail, the petitioners filed a petition for direct review in this court. Ill. Rev. Stat. 1987, ch. 48, par. 1716(a).

On July 14, 1989, the City filed a motion to dismiss the petition on the ground that the unions failed to file the petition in a timely fashion under Supreme Court Rule 303 (107 Ill. 2d R. 303). The City explained that it had not filed a motion to dismiss earlier because it had relied on an opinion of the Fifth Appellate District, *City of Benton Police Department v. Human Rights Comm'n* (1986), 147 Ill. App. 3d 7, 497 N.E.2d 876, and an opinion of the Fourth Appellate District, *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 493 N.E.2d 1130 (hereinafter *Board of Education*). Both cases had held that the time for filing petitions for direct review in the appellate court, rather than a complaint for review in the circuit court, was subject to the requirements of the Administrative Review Law, which provides that an appeal to the circuit court of a decision of an administrative agency must be filed within 35 days. (Ill. Rev. Stat. 1987, ch.110, par. 3—103.) However, the First Appellate District rendered an opinion on June 30, 1989, holding that the petition for review was subject to the 30-day time requirement of Supreme Court Rule

303(a) (107 Ill. 2d R. 303(a)). (*County of Cook v. Illinois Local Labor Relations Board* (1989), 189 Ill. App. 3d 1057, 545 N.E.2d 934.) The court refused to follow *Benton Police Department* and *Board of Education*.

The respondents argue that we should follow *County of Cook*. However, we have concluded that we need not determine whether *County of Cook* was correctly decided, because we agree with the unions' alternative argument that they timely filed their petition regardless of whether the Administrative Review Law or the supreme court rule applies. (The City did not respond to this alternative argument.) In resolving the issue, our first task is to determine which statute or rule is applicable to the method of service of the Board's order.

■■ Section 3—103 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 3—103) provides as follows:

"§3—103. Commencement of action. Every action to review a final administrative decision shall be commenced by the filing of a complaint and the issuance of summons within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected thereby. The method of service of the decision shall be as provided in the Act governing the procedure before the administrative agency, but if no method is provided, a decision shall be deemed to have been served either when personally delivered or when deposited in the United States mail, in a sealed envelope or package, with postage prepaid, addressed to the party affected thereby at his or her last known residence or place of business."

■■ In *County of Cook* the court held that the requirement that a complaint be filed within 35 days was in conflict with Supreme Court Rule 303(a) (107 Ill. 2d R. 303(a)), which provides that notice of appeal from a judgment entered in the circuit court must be filed within 30 days after entry of judgment. The court relied, in part, on Supreme Court Rule 335 (107 Ill. 2d R. 335), which governs direct appeals to the appellate court from the order of an administrative agency. But there is nothing in Rule 335 or any other supreme court rule dealing with the method of service of the administrative decision. Consequently, that portion of section 3—103 dealing with the method of service is not in conflict with any supreme court rule. Therefore, we accept the applicability of section 3—103 insofar as it deals with the method of service.

■■ The next question is whether the act governing the procedure before the agency has provided for the method of service. The Public Labor Relations Act (Ill. Rev. Stat. 1987, ch. 48, par. 1611(a)) provides for direct review in the appellate court in accordance with the Admin-

istrative Review Law. But the Public Labor Relations Act itself is silent as to the method of service. However, in *Gemini Services, Inc. v. Martin* (1986), 141 Ill. App. 3d 17, 489 N.E.2d 1145, the court held that an agency, under its general rulemaking power, may promulgate a regulation determining when service of its orders is deemed complete. Therefore, the final question is whether the ILLRB has promulgated a regulation determining when service of its order is deemed complete. The answer is that it has.

■ The pertinent regulation provides as follows:

"a) In computing any period of time prescribed by the Act or these rules, the day of the act, event, or default after which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included. If the last day falls on a Saturday, Sunday, or legal holiday, the time period shall be automatically extended to the next day that is not a Saturday, Sunday or legal holiday.

* * *

c) Whenever a time period begins running upon the service of notice or other document upon a party, and service is effected by mail, three days shall be added to the prescribed period." 80 Ill. Adm. Code §1200.30 (1985).

■ The Board's decision was mailed on August 25, 1988. Under the regulation, three days are to be added to the prescribed period making the effective date of service August 28. Therefore, the petition for review was timely filed 30 days later on September 27, within the limit under Rule 303(a).

We note that the conclusion we reach is in accordance with *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 493 N.E.2d 1130. *County of Cook* disagreed with *Board of Education* but not on the question of the method of service and the computation of time.

For these reasons, the motion to dismiss the petition for review is denied.

Local 1001 and Local 1092 are affiliated with the Laborers International Union of North America. Local 1001 represents a bargaining unit of 3,000 to 3,500 individuals employed by the City; Local 1092 represents approximately 1,200 individuals employed by the City. The unions have represented City employees for approximately 50 years on an informal basis. In 1984, the City granted the unions "historical recognition."

From the summer of 1984 to early 1985, the City negotiated a

"Master Agreement" with a coalition of 42 local labor and trade unions, including Local 1001 and Local 1092. Subsequently, from March 1985 to February 1986, the City entered "local" negotiations with Locals 1001 and 1092, the result of which was a collective bargaining agreement (the Local Agreement) that adopted the general provisions of the Master Agreement and addressed the specific relationship between the City and the unions. Articles 13 and 15 of the Local Agreement set forth specific procedures to be followed by the City in laying off or recalling employees and in filling job vacancies within the unions' bargaining units. The Master Agreement and the Local Agreement became effective on February 13, 1986, and were scheduled to expire on December 31, 1987.

Section 15.1 of the Local Agreement deals with the procedures to be followed in the filling of permanent job vacancies within the bargaining units. In substance the required procedure is as follows: After the City determines that a permanent vacancy in a department is to be filled, employees within that department may request to fill that vacancy; seniority is preferred; if no one from that department makes a request, the City shall appoint an individual from the recall or reinstatement list consisting of the names of former employees in that department; if there are no eligible employees from the recall list, the City shall post the job for bidding. Applications may be made by existing employees and nonemployees, but employees shall have preference unless the nonemployees are demonstrably more qualified. Similarly, seasonal employees with recall rights shall have preference over nonemployees unless the nonemployees are demonstrably more qualified.

Several disputes have arisen between the City and the unions regarding the proper interpretation of section 15.1. The unions claim that an interdepartmental "secondary recall right" exists mandating a preference for the recall of union members previously laid off from one department to equal- or lower-rated jobs in any other department in which a vacancy exists. The City asserts that this recall right is limited to employees who have been laid off from the department in which the vacancy exists. The unions also claim that section 15.1 restricts bidding to employees of the bargaining unit in which the vacancy exists, whereas the City claims that any employee in any local that signed the Local Agreement can bid on a vacancy. The unions contest the manner in which the City applies preferences in the bidding and application process, both as between bargaining unit bidders and non–bargaining-unit bidders and as between bidders (union members) and applicants (nonunion members). The unions also contest the City's practice of requiring bidders to complete applications in addition to bid forms. Fi-

nally, the unions suspect that the City has manipulated the selection process to favor certain individuals. Since the unions suspect that the City is not following the required procedures, they maintain that the requested documents are necessary for a determination of whether the City is following the terms of the agreement. The City contrarily contends that the unions do not need the requested documents but want them so that they may look over the City's shoulder as the City makes its hiring decisions. The City succinctly puts it that the unions want to become the City's "partner" in the hiring process.

As a result of these disputes and the refusal of the City to make the requested information available, the unions have filed grievances in every case where a vacancy occurs. After the grievance is filed, the City then turns over the information it had previously refused to provide.

A proper analysis of the problem requires a determination of what information the unions get pursuant to the agreement and what additional information they seek.

Section 2.6 of the Local Agreement requires the City to provide unions on a monthly basis with the following:

(a) a "bargaining unit report" listing current active employees;

(b) an "activity report" indicating disability, retirements, resignations, discharges, terminations, leaves, suspensions, reinstatements, reappointments, transfers, appointments (including promotions and demotions) and the deaths of current active employees; and

(c) an overtime report for current active employees.

Section 2.6 also requires that the City annually provide the unions with a seniority list for the bargaining unit. Finally, the City must allow the unions to review bargaining unit personnel transaction reports (PER-14's) on a weekly basis. PER-14's reveal that a vacancy was filled and by whom.

The additional materials requested by the unions for each vacancy before it is to be filled are the following:

(1) The request-to-hire form made to the Department of Personnel by the head of the requesting department. That form includes the "B" form, which details the operating department's hiring criteria, and the "A" form, which asks for authority to hire.

(2) The authorization-to-hire form, which is the "A" form after it has been signed by the commissioner of personnel and the budget director. When the authorization-to-hire form is com-

pleted, a vacancy exists.

(3) Notice of job opportunity. This is the document which is posted advising all interested parties of the vacancy.

(4) The Shakman referral list and employment decision form. The Shakman referral list contains the names of all bidders and applicants screened by the City, thus defining the competitors for the job opening.

(5) All bids from bargaining unit employees.

(6) All applications from non–bargaining-unit employees and nonemployees.

(7) Hiring criteria rating forms. These forms are filled out by an interviewer who rates the bidder or applicant according to the hiring criteria on the "B" form of the request-to-hire form. The applicant's score is recorded on the hiring criteria rating form. Each criterion is given a certain weight, and a total score is determined.

(8) PER-14's. After the Department of Personnel receives a completed rating form and the successful candidate is appointed to fill the vacancy, the hiring department generates a PER-14 form indicating the change in the appointed employee status. Under the local agreement, once each week, the unions may review the PER-14 forms on file at the Department of Personnel. The City also provides the same information in the monthly bargaining reports given to the unions under the Local Agreement.

Before discussing the arguments of the parties, it is necessary to set forth the applicable law.

■ Because section 10(a) of the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1987, ch. 48, par. 1610(a)) parallels the Federal counterpart (National Labor Relations Act, 29 U.S.C. §158(a) (1982)), the Illinois courts may look to Federal decisions in interpreting this portion of the Illinois act. *American Federation of State, County & Municipal Employees, Council 31, AFL-CIO v. Illinois State Labor Relations Board* (1988), 175 Ill. App. 3d 191, 529 N.E.2d 773 (hereinafter *AFSCME, Council 31*).

■ ■ Our study of Federal law leads to the conclusion that an employer's failure to furnish relevant information to unions during contract negotiations may constitute an unfair labor practice. (*National Labor Relations Board v. Truitt Manufacturing Co.* (1956), 351 U.S. 149, 100 L. Ed. 1027, 76 S. Ct. 753.) The Supreme Court subsequently expanded on the *Truitt* holding, stating that "the duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the term of an

agreement." (*National Labor Relations Board v. Acme Industrial Co.* (1967), 385 U.S. 432, 436, 17 L. Ed. 2d 495, 499, 87 S. Ct. 565, 568.) "Relevant" information includes material that would be of use to the union in carrying out its statutory duties and responsibilities. (*Acme Industrial Co.*, 385 U.S. at 437, 17 L. Ed. 2d at 499-500, 87 S. Ct. at 568.) Citing *Truitt Manufacturing Co.* and *Acme Industrial Co.*, the Supreme Court held that the employer's duty to bargain collectively "includes a duty to provide relevant information *needed* by a labor union for the proper performance of its duties as the employees' bargaining representative." (Emphasis added.) (*Detroit Edison Co. v. National Labor Relations Board* (1979), 440 U.S. 301, 303, 59 L. Ed. 2d 333, 339, 99 S. Ct. 1123, 1125.) The *Detroit Edison* court, however, added that the union's right to disclosure is not absolute and the union's "interests in arguably relevant information [need not] always predominate over all other interests, however legitimate." 440 U.S. at 318, 59 L. Ed. 2d at 348, 99 S. Ct. at 1132.

▄▄ The first issue before us, therefore, is whether the information sought is relevant. We accept the unions' contention that information which would assist the unions in determining whether to file a grievance is relevant; and we accept, for the sake of argument, their contention that some of the information sought might make it easier for the unions to decide whether to file a grievance. Our acceptance of those contentions necessarily leads to our holding that the information sought is relevant. But that does not end the problem. Even accepting relevance, the court must weigh the interest of the City against those of the unions. *Shell Oil Co. v. National Labor Relations Board* (9th Cir. 1972), 457 F.2d 615.

Boiled down, the unions' position is that it must have the information before the filing of a grievance and not after. As the unions couch the issue, it is not *what* is provided, it is *when* it is provided.

▄▄ At this point, it is appropriate to express agreement with the unions' argument that the hearing officer and, implicitly, the Board were in error in holding that requiring the criteria forms to be turned over would have a chilling effect on the candor of the interviewers. The fact that the City does turn over the material after a grievance is filed disproves that holding. We note that the City did not advance that argument below. Similarly, we agree with the unions that the fact that the City continues to turn over all the material sought in the face of the automatic filing of a grievance in every case where a vacancy has been filled weakens any conclusion that providing the material is unnecessarily burdensome to the City, *insofar as the volume of documents may be concerned.* Finally, we agree with the unions that the fact that

some of the information sought may be available from other sources does not completely vitiate the unions' position. See *ASARCO, Inc., Tennessee Mines Division v. National Labor Relations Board* (6th Cir. 1986), 805 F.2d 194.

 Our agreement with those arguments of the unions, however, does not support our reversal of the Board's ultimate holding. We repeat that the issue is whether the City is obliged to provide the material requested as a matter of routine. We know that the unions suspect that the Board may not be following proper procedures. But mere "suspicion" is not enough. (*San Diego Newspaper Guild, Local No. 95 v. National Labor Relations Board* (9th Cir. 1977), 548 F.2d 863, 868.) "The practical burden upon the union then is to show that the information will aid investigation of contract violations 'where the union has established a reasonable basis to suspect such violations have occurred.' " (*Walter N. Yoder & Sons, Inc. v. National Labor Relations Board* (4th Cir. 1985), 754 F.2d 531, 535, quoting *NLRB v. Associated General Contractors* (9th Cir. 1980), 633 F.2d 766, 771-72.)

To support the unions' contention that more than mere suspicion prompts their need for the demanded information, the unions point to three grievances filed by the unions which were successful in that the arbitrator agreed with the unions' position. In the first case the arbitrator found that the City had failed to provide information concerning the change from three-man to two-man refuse collection crews. That grievance had nothing to do with the hiring process as provided by section 15.1. In the second grievance the arbitrator found that the City had not complied with section 15.1 in filling three vacancies in the water department. In the last grievance, the decision of the arbitrator was made after the proofs had been closed before the Board, and the Board refused to consider it. In the grievance the arbitrator ordered a new evaluation of an applicant, and, we are informed, the later evaluation resulted in a higher score for the applicant. For the sake of argument in this appeal, we will consider the last grievance as well as the second. We agree with the City's position that a showing that the City erred in the manner of filling four vacancies in a work force of almost 5,000 members does not support a conclusion that the City might be engaging in general violations of the contract. Far from it; an opposite conclusion may be more fairly drawn. The unions certainly have not shown a routine course of conduct on the part of the City that would justify the relief demanded by the unions.

The unions' complaint sought to permanently enjoin the City from filling vacancies until it first provided the information demanded. We are informed by the unions, and the City agrees, that the unions now

do not seek to prevent the filling of vacancies until the demanded information is provided to the union. The complaint, however, does ask that every document used in the multistep procedure followed by the City in filling vacancies be turned over to the unions. The unions have candidly told us that they want "verification of every step of the hiring procedure." The only reasonable procedure to be adopted by the City would be to send a copy of each document to the union at the time the document was completed. The unions complain that under the present procedure they "have no opportunity to *intervene* or *prevent* violations of the agreement." (Emphasis added.) We infer from that argument that the unions would seek to be able to intervene at any stage. The unions concede that one vacancy could involve more than one grievance. To illustrate, after reception of the Shakman referral list, the unions could conclude that improper persons were included and file a grievance. After "several months until the grievance procedure had been followed," to use the unions' own words, the grievance could be resolved. After reception of the hiring criteria forms, however, the unions could file another grievance with another attendant "several months" to resolve that grievance. The burdensome nature of such a procedure is manifest.

There are two arguments raised by the unions which should be answered. First, they say that to require them to file a grievance in all cases is to require them to represent one union member against another. Our answer is twofold: It is not necessarily true in all cases; there may be instances where the grievance concerns a position filled by a nonunion applicant. Second, there may be instances when, after investigation, the unions will determine that one union member has indeed a greater right to a position than another union member. Consequently, it will be required to represent one against the other. The unions recognize that adverse representation may be necessary "occasionally."

The unions' other argument is that requiring them to seek the information from union members imposes an unnecessarily heavy burden upon them. The answer to that argument is that even if the unions were to receive all the documents they request, investigation on their part would still be required. The bid applications and the Shakman referral lists themselves do not tell the unions who is or who is not a proper applicant or bidder. Similarly, the face of the criteria forms will not inform the unions that improper criteria were used. In short, investigation and interviews will still be required.

The pertinent holding of the Board is as follows:

"The records which are available to [the unions] under Section

2.6 of the contract provide them with substantial contemporaneous data regarding the vacancies which have been filled within their units. That data, together with information which may be brought to [the unions] by the employees they represent, should be adequate to enable [the unions] to identify potentially grievable transactions. Once a transaction has been grieved, [the unions] are able to obtain the additional documentation necessary to evaluate and pursue the grievance. [The unions] simply have not demonstrated that they cannot effectively police and enforce the contract under these circumstances. *They surely have not shown that their need for additional information is so substantial as to warrant requiring the City to share virtually every document which its agents generate in the process of posting and filling each vacancy within their bargaining units.*" (Emphasis added.)

We have previously observed that the fact that some of the information sought may be available from other sources does not completely vitiate the unions' position. By that observation we do not mean to say that the fact that information may be available to the unions from other sources, including their own employees, is never probative. In this case we believe that it is and that the Board properly considered it.

▇▇ The applicable standard of review in this case is no different from that of any other administrative review case: The findings of fact by the agency are *prima facie* true and correct (Ill. Rev. Stat. 1987, ch. 110, par. 3—110), and a reviewing court may not substitute its judgment for that of the agency unless it can be said as a matter of law that those findings are against the manifest weight of the evidence. (*AFSCME, Council 31*, 175 Ill. App. 3d 191, 529 N.E.2d 773.) A factual determination is against the manifest weight of the evidence where an opposite conclusion is clearly evident from the record. (*Burke v. Board of Review* (1985), 132 Ill. App. 3d 1094, 477 N.E.2d 1351.) The unions have the burden in this court of proving that the Board was wrong, and this court may not substitute its judgment for that of the Board. *Mead v. Board of Review* (1986), 143 Ill. App. 3d 1088, 494 N.E.2d 171.

▇▇ Our review of the record does not convince us that a conclusion opposite to that reached by the Board is clearly evident. For that reason, the Board's holding that the unions failed to establish an unfair labor practice on the part of the City is affirmed.

The Board held that the complaint should be dismissed on the additional ground that the unions had waived their right to the information

sought when they signed the Local Agreement. The pertinent provision, called the "zipper clause," is section 25 and provides as follows:

"This Agreement constitutes the entire contract between the Employer and the Union and settles all demands and issues with respect to all matters subject to collective bargaining. The Employer and the Union, therefore, voluntarily waive the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any matter which is subject to collective bargaining whether or not such matter is specifically referred to herein, and even though such matter may not have been within the knowledge or contemplation of the parties at the time this Agreement was negotiated or signed."

The Board agreed with the City's contentions that section 2.6 of the Local Agreement represents the unions' and the City's agreement as to all the information required to enforce section 15.1, which deals with the filling of vacancies, and that the "zipper clause," when read in conjunction with section 2.6, constituted a waiver by the unions of a right of routine access to any other information. It is again our judgment that the Board's holding is not against the manifest weight of the evidence.

The unions and the City addressed the contents of section 2.6 during their negotiations of the Local Agreement. The City suggested that it provide the unions with a bargaining unit list, and, following discussions of the proposal, a subcommittee was formed to deal with the issue of information to be provided to the unions. The subcommittee, composed of the City's director of employee relations, Sharon Corrigan, and Local 1001's secretary/treasurer, Bruno Caruso, met three or four times between June 1985 and November 1985. Corrigan testified that these meetings involved "an open exchange of information."

During the contract negotiations, the parties exchanged various written versions for a proposed section 2.6. Before the effective date of the collective bargaining agreement, the City had used the forms presently sought by the unions, with the exception of the documents to be used in the bidding process. The reason that the City had not used the bidding documents before was that bidding did not exist until the Local Agreement was made. The unions, however, never requested any of these forms during the contract negotiations. A witness testified that the unions learned of the specific forms used by the City in the hiring process at an arbitration hearing on May 29, 1987, after the Local Agreement had been signed.

■■ This court has approved the policy reflected in the Federal cases which hold that negotiated zipper clauses should be enforced. In

*East Richland Education Association, IEA-NEA v. Illinois Educational Labor Relations Board* (1988), 173 Ill. App. 3d 878, 528 N.E.2d 751, the court upheld the defendant Board's decision that a teachers' union had waived, in a zipper clause, its right to mid-term bargaining regarding changes in the school calendar. In so doing, the court quoted from a Federal decision, stating as follows:

" 'A grudging or stilted interpretation of collective bargaining agreements tends to encroach upon the fundamental national policy favoring the ordering of the employer-employee relationship by voluntary bargaining rather than governmental fiat [citation]; it injects into the collective bargaining process an uncertainty that diminishes the prospects for successful bargaining. [Citations.]' *** The same rationale supports the Board's decision here." 173 Ill. App. 3d at 908-09, quoting *Local Union 1395, IBEW v. National Labor Relations Board* (D.C. Cir. 1986), 797 F.2d 1027, 1031-32.

Although a witness testified for the unions that the unions were unaware of the specific documents used by the City until after the agreement was in effect, it is inconceivable that the unions would be unaware that the persons evaluating applicants would make some sort of record in the evaluation process. The unions had to know under section 15.1 that some evaluator would have to determine in writing whether one applicant or bidder was "demonstrably more qualified" than another. Similarly, the unions had to know that applications and bids would be submitted in a written form. They had to know that the City would post a notice of job opportunity and keep a record like the Shakman referral list. Under these circumstances a finding that the unions knowingly waived the right to receive routinely any information other than that specified in section 2.6 is not against the manifest weight of the evidence.

We conclude that the zipper clause in this case is substantially the same as that in *East Richland,* and we are not persuaded that *East Richland* is distinguishable because it involved a change in the agreement, while this case involves enforcement of the agreement.

For all these reasons the order of the Board is affirmed.

LaPORTA, P.J., and McNAMARA, J., concur.